2021 PA Super 7

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KYLE LITTLE | : | |
| | : | |
| Appellant | : | No. 2775 EDA 2019 |

Appeal from the PCRA Order Entered August 23, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0900471-2006

BEFORE:   BENDER, P.J.E., KUNSELMAN, J., and PELLEGRINI, J.[*]

OPINION BY PELLEGRINI, J.:                    **FILED:  JANUARY 15, 2021**

Kyle Little (Little) appeals the order of the Court of Common Pleas of Philadelphia County (PCRA court) denying his petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546.  Following a jury trial in 2007, Little was found guilty of first-degree murder (18 Pa.C.S. § 2502(a)) and possession of an instrument of crime (18 Pa.C.S. § 907(A)).  He was sentenced to a mandatory term of life without the possibility of parole on the murder count and a consecutive term of 1.5 years as to the possession count.  The judgment of sentence was affirmed on direct appeal.  ***See Commonwealth v. Little***, 2556 EDA 2011 (Pa. Super. November 27, 2012).

Little subsequently filed a PCRA petition and argued in part that his counsel was ineffective in failing to preserve an issue for direct appeal relating

_____

[*] Retired Senior Judge assigned to the Superior Court.

to a restriction on questioning of a defense witness, Khaliaf "Chuck" Alston (Alston). The PCRA court awarded Little resentencing on an unrelated constitutional issue,[1] but denied a new trial on the ineffectiveness ground. Little appealed, and a panel of this Court initially determined that Little was entitled to re-raise the unpreserved issue, *nunc pro tunc*, as a remedy for counsel's ineffectiveness.[2]

The Commonwealth applied for reconsideration, which the original panel granted. **See Commonwealth v. Little**, 2775 EDA 2019 (Pa. Super. Oct. 5, 2020) (order). This new panel has reviewed the appeal and agrees with the previous disposition that, after objecting and arguing a potentially meritorious evidentiary issue, but then waiving the issue after the court gave an adverse ruling, counsel was ineffective, entitling Little to raise the waived issue in a new appeal. As to that claim, we reverse the PCRA court's order denying relief and remand with instructions.

---

[1] Little had asserted in his PCRA petition that his life sentence violated **Miller v. Alabama**, 567 U.S. 460 (2012), and **Montgomery v. Louisiana**, 136 S. Ct. 718 (2016), which prohibit mandatory life terms for juvenile offenders, and life terms absent consideration of special circumstances, respectively. The trial court granted relief on this claim, and the Commonwealth did not oppose it. **See** Trial Court 1925(a) Opinion, 8/23/2019, at 1 n.2.

[2] The PCRA court's denial of all of Little's other claims was affirmed for the reasons set forth in the PCRA court's opinion. We again affirm as to those claims.

**I.**

**A.**

It is difficult to summarize the material evidence adduced at Little's murder trial, even in the light most favorable to the Commonwealth, because the only two eyewitnesses presented by the prosecution (Hassan Kinard and Brandon Mundy) gave conflicting and internally inconsistent accounts of what transpired.

The two witnesses agreed on this much: the victim, Lamont Adams (Adams), was killed in September 2004 when the perpetrator shot him several times with a .40-caliber gun.[3] **See** Trial Transcript, 11/6/2007, at p. 102; Trial Transcript, 11/7/2007, at p. 162. Forensic evidence showed that Adams was shot a total of 14 times with a similar type of weapon to the one the witnesses described.[4] At trial, Kinard and Mundy identified Little as the sole shooter. Little's defense was that the two men had misidentified him.

_____

[3] Our summary of the case facts is gleaned from the PCRA Court's 1925(a) opinion and the certified record.

[4] Approximately one month after Adams' death, police took Little into custody after he was seen discarding two .40 caliber guns into a trashcan. The jury was instructed in Little's trial that there was no forensic link between those weapons and the firearm used to kill Adams. The jury could only use that knowledge to determine whether he "had familiarity with, knowledge of and the means to access .40-caliber handguns within approximately one month after the incident in his case." Trial Transcript, 11/14/2007, at pp. 26-27. Further, it was undisputed that defense witness Alston was known to carry a .40 caliber handgun and, in fact, this was the type of weapon police retrieved

Kinard was the first witness to report the incident to police. About three months after it happened, he was serving probation for drug-related offenses. While speaking with his probation officer about threats he was receiving in the neighborhood, he mentioned for the first time that he had seen Adams get shot. *See* Trial Transcript, 11/6/2007, at p. 130. That same day, Kinard met with detectives who showed him a photo of Little and other individuals who they believed were involved. *Id*. at p. 142.

In a second interview with different detectives about a week later, Kinard remarked on Little's photo as if he did not personally know him or of his involvement in the Adams shooting, saying, "They said that this is the Kyle [Little] that killed Lamont [Adams]." *Id*. at p. 142. At no point did Kinard ever say that Alston was present at the scene of Adams' murder.

While describing a separate gun-related incident, Kinard referred to Alston's younger brother, Ronald "Ronnie" Alston (Ronnie) as Adams' killer: "[I]t was Ed, Kyle [Little] and the boy that killed Lamont [Adams], I think they call him Ronnie[.]" *Id*. at p. 149. Kinard changed his mind about Ronnie's involvement when he was convinced *by the detectives* that Ronnie could not have shot Adams because no "sparks" had come off the gun he was holding.

_____

from him a few weeks before the shooting, causing his initial hostility toward Adams. *See* Trial Transcript, 11/7/2007, at p. 230.

- 4 -

*See* Trial Transcript, 11/7/2007, at p. 78. Kinard explained that he "thought [he] saw [Ronnie] shoot, but he didn't." *Id*. at p. 80.

At trial, though, Kinard retracted his earlier statements implicating Ronnie and named Little as the sole shooter. Kinard recounted that he had been walking up the street in the area near the shooting when he came across Little and Ronnie. *See* Trial Transcript, 11/6/2007, at p. 91. Kinard greeted them as they walked past him in the opposite direction and Little said in reference to Adams, "I'm about to go get that ni**er." *Id*. at p. 97.[5]

Soon thereafter, Kinard heard Little and Ronnie arguing loudly with Adams, and when Adams walked a few steps away, Little shot him. *Id*. at p. 92. Kinard testified that Ronnie had drawn his own weapon while Adams was being shot, but insisted he was positive that Ronnie did not open fire. *Id*. at p. 124.

Kinard attempted to explain that when he gave earlier inconsistent statements, such as telling detectives that he thought he saw "Ron shoot too," he was "confused" by the repetitive questions asked "over and over" again by detectives for a period of "hours". *See* Trial Transcript, 11/7/2007, at pp. 67-

---

[5] In his earlier statement to police, Kinard attributed this comment to both Little and Ronnie. *See* Trial Transcript, 11/7/2007, at pp. 62-70. Furthermore, unlike in his trial testimony, Kinard omitted from his statements to police that he had seen Little and Adams arguing loudly prior to the shooting. *Id*. at pp. 165-66, 169.

71. He maintained that his trial testimony reflected what had really happened and that his earlier accounts were inaccurate.

The Commonwealth's second eyewitness, Mundy, contradicted Kinard in several ways. Mundy testified that Kinard and Ronnie were not even present at the scene of the shooting. *See* Trial Transcript, 11/7/2007, at pp. 154, 161, 215-17. Just as noteworthy as the absence of Kinard and Ronnie in Mundy's account was the presence of Alston.

According to Mundy, the shooting stemmed from an incident in July 2004 that occurred during a game of dice between Adams, Little, Alston and a number of other players. *See id*. at p. 149. Adams lost all of his money, and as he walked away, he was seen talking on a cellular phone. Minutes later, police arrived near the scene of the dice game and arrested Alston for possessing a firearm. *Id*. at p. 151.

Mundy recalled that by September, Alston had been released from custody but he harbored a grudge against Adams, believing that he had called the police in retaliation for losing in the dice game. While outside together that night near the corner of North 26th Street and West Cambria Street, Little, Alston and several others saw Adams walk by. Mundy heard Alston say, "That's the boy that told on me . . . I'm about to go pop him." *Id*. at pp. 148, 153.

Mundy testified that Ronnie left the area for 10 to 15 minutes after Alston had asked him to go get a gun. *Id*. at pp. 208-09. Another member

of the group, "Matt," said he was willing to shoot Adams, to which Little replied, "I got it. I got it." *Id*. at pp. 208, 248-49.

Unlike Kinard, who had testified that Ronnie was next to Little and drawing a weapon as Adams was shot, Mundy testified that Ronnie had left and had not returned until after the shooting was over. *Id*. at pp. 148, 155, 209, 217. Additionally, Mundy stated that only Alston was angry with Adams for calling the police after the dice game months earlier, and that Little had no personal dispute with him. *Id*. at p. 229. Mundy even had to physically restrain Alston from attacking Adams when he initially walked past their group moments before he was shot. *Id*. at pp. 250-52.

**B.**

Little's defense counsel presented only one defense witness, Alston, who testified that he alone shot Adams. *See* Trial Transcript, 11/13/2007, at p. 32. Alston confirmed that he had conferred with his own counsel and been advised of how admitting to Adams' murder could potentially be used against him. *Id*. at pp. 24-26, 46-47. He stated that he was currently serving two consecutive sentences of life without parole for a second-degree murder conviction and a third-degree murder conviction. *Id*. at pp. 28-32.

Alston testified that on the day of the murder, he saw Adams walking up the middle of the street near where he was standing. *Id*. at p. 35. He was nervous because Adams had robbed him at gunpoint about a week earlier. *Id*. at p. 33. Further, it appeared to Alston as if Adams was reaching under

his shirt for a weapon while walking toward him, so Alston felt he had to open fire to protect himself. *Id*. at p. 37.

Although Adams had fallen down after the first shots, Alston testified that he kept shooting at Adams in case he was armed: "[T]hen I kept shooting him because I wanted to make sure he didn't get up and shoot me, I didn't know if he had a gun on him." *Id*. Alston testified that Little, Kinard and Ronnie were not present to witness the shooting, but that Mundy was there that night and took away the weapon that Alston had used. *Id*. at p. 40.

Defense counsel attempted to ask Alston on direct examination if he was aware that he could potentially face the death penalty for killing Adams, but the trial court sustained the Commonwealth's objection to the question. *Id*. at p. 47. Next, defense counsel attempted to ask Alston if he could anticipate what would happen to him because of his testimony and again the trial court sustained the Commonwealth's objection. *Id*. at pp. 47-48.

Significantly, the first question the Commonwealth asked Alston on cross-examination was whether he was serving two consecutive life sentences. *Id*. at pp. 48-49. Alston answered that he was. *Id*. The Commonwealth's second question was, "So as you sit here in court, you are never getting out of jail; correct?" *Id*. at p. 49. Alston again answered affirmatively. *Id*.

At a sidebar moments later concerning the scope of the cross-examination, the Commonwealth explained that it sought to elicit facts about

other cases in which Alston had testified favorably for friends standing trial. *Id*. at pp. 53-56. In those other cases, Alston had claimed that the wrong person had been charged but he did not admit he had committed the crimes. *Id*. The Commonwealth nevertheless speculated that Alston had developed a pattern of testifying for his friends, and that once Alston's own trial had concluded, his "motives ha[d] changed" and he no longer had the need to defend himself. *Id*. at p. 54. The Commonwealth believed that unlike in the earlier trials, Alston "is serving his life sentences, he has nothing to lose." *Id*.[6]

Defense counsel responded that Alston had never before testified in other cases as a self-admitted guilty party, and that by taking the blame in Little's case, he potentially faced the death penalty, giving him a motive *not* to testify and making his admission more credible. Defense counsel again asked to question Alston about his awareness of such exposure:

> **Defense counsel**: [If the Commonwealth gets] into the fact that he has nothing to lose, then on redirect, so the Court isn't surprised, I'm going to ask him, you have been advised that if you testify in this case you could be arrested for first-degree murder and face the death penalty, so he does have something to lose by this testimony in this courtroom.
>
> **The Commonwealth**: He's never going to be prosecuted for the murder of Lamont Adams, he has nothing to lose.
>
> **Defense counsel**: Well, I don't know that.

---

[6] Alston was interviewed by police a few months after Adams' shooting and admitted he was present in the area but denied being the shooter and gave no further statements at that time.

*Id*. at pp. 64-65.

The trial court established that Alston indeed would qualify for the death penalty, but then ended the sidebar without explicitly ruling on defense counsel's proposed re-direct. *Id*. at pp. 65-66. Immediately upon beginning the re-direct, defense counsel confirmed that Alston was 19 years old at the time of the subject shooting, establishing one of the requisites of death-penalty eligibility. *Id*. at pp. 95-96.[7]

The next question concerned the potential consequences Alston faced by testifying at Little's trial. At that point, the Commonwealth objected on the grounds of relevance and the trial court sustained the objection. Defense counsel again requested a sidebar and moved *in limine* to preclude the Commonwealth from arguing to the jury that Alston had "nothing to lose by coming into this court and giving his testimony." *Id*. at pp. 96-98.

Defense counsel also proffered that since the Commonwealth was allowed to elicit on cross-examination that Alston was serving two life

---

[7] A defendant may be eligible for the death penalty in Pennsylvania if, during the commission of a first-degree murder, he was over the age of 18, and a jury finds there to be aggravating circumstances, including the commission of a felony during the killing, such as illegal possession of a firearm. *See* 42 Pa.C.S. § 9711(d)(6); *see also Roper v. Simmons*, 543 U.S. 551 (2005) (holding that subjecting juveniles under the age of 18 to the death penalty violates the Eighth Amendment). Another potentially applicable aggravator against Alston would be that the victim was killed in retaliation for providing police with information concerning criminal activity. *See* 42 Pa.C.S. § 9711(d)(15).

sentences, then he would seek to ask Alston on re-direct if he understood that "he could be subject to being arrested and charged with first-degree murder and facing a possible sentence of death." *Id*. The trial court ordered defense counsel not to ask such a question because "whether he could be subject to death, that's too much speculation as between now and then[.]" *Id*. Defense counsel acknowledged the ruling by replying, "Very well," and once the examination resumed, the trial court sustained the Commonwealth's earlier objection. *Id*. at p. 98.

## C.

After Alston's testimony had concluded and in preparation for closing statements, defense counsel sought to limit the Commonwealth's ability to argue that Alston would face no consequences for his testimony. In yet another motion *in limine*, defense counsel stressed that Alston's exposure to the death penalty would make it misleading for the Commonwealth to suggest that he had nothing to lose from taking the blame for Adams' murder. Defense counsel asked in the alternative to rehabilitate Alston by countering the Commonwealth's claim and explaining that Alston would be death-penalty eligible.

The trial court denied the defense motion and permitted the Commonwealth to argue that Alston had "nothing to lose." The defense was prohibited from arguing that Alston faced potential execution by admitting to Adams' murder. The trial court found that the possibility of the death penalty

would be irrelevant because there was no evidence that the Commonwealth intended to bring that charge against Alston – "whether or not he's going to be charged and would be facing the death penalty, I just don't know why that's relevant in this case." *Id*. at p. 126.

The trial court appeared to overlook what Alston may have subjectively thought would come of his admission, instead finding that since the *prosecutor* did not find Alston credible, it was unlikely that he would ever be charged, making a potential death penalty immaterial. *Id*. at pp. 124-31.[8] The trial court did not refer to any certification from the Commonwealth that Alston had official immunity relating to Adams' murder and the record contains no evidence to that effect.

Having prevailed on the defense's motion *in limine*, the Commonwealth addressed Alston's testimony during closing argument in large part by attacking his credibility. *Id*. at pp. 194-96. The Commonwealth attempted to undermine Alston's testimony by stressing that his sole motive was to do Little a favor. *Id*. The jury was told further that Alston could lie on the stand without fear of any practical consequences: "Alston is serving two consecutive

---

[8] Once the trial court denied defense counsel's motion to restrict the Commonwealth's closing argument and instead restricted the defense's closing, counsel did not object (or renew an objection) to the earlier ruling limiting the scope of Alston's examination.

life sentences, of course he can get up here and say whatever he wants." ***Id***. at pp. 195-96.

## D.

Little was found guilty and sentenced to a life term. He filed a direct appeal, *nunc pro tunc*, in 2011, and one of the issues he raised was whether the trial court had erred in prohibiting defense counsel from rehabilitating Alston's credibility after the Commonwealth had elicited that Alston was serving two consecutive life sentences in unrelated cases.[9] This Court held that the issue was waived for the purposes of direct appeal because when the trial court limited defense counsel's re-direct examination of Alston, defense counsel seemed to acquiesce to the ruling without reasserting an objection:

> [T]he issue of the extent to which Little could examine Alston regarding the consequences of his admission of guilt in shooting Adams was joined by the parties and the trial court. The trial court ruled that Little could ask Alston if he understood that he could be convicted for Adams' murder, but could not further ask Alston if he understood that a possible sentence for such a conviction is death. **Counsel for Little agreed with this resolution of the issue and did not reassert his objection or otherwise express any disagreement with the trial court's resolution. Instead, he merely said "Very well" and moved on with his examination of Alston**.

---

[9] Little's initial direct appeal was dismissed as untimely. The PCRA court granted a direct appeal *nunc pro tunc* on September 16, 2011, and ordered that Little file a 1925(b) statement. Little complied and raised, *inter alia*, the claim that defense counsel had failed to preserve the rehabilitation issue with respect to Alston. The trial court filed a 1925(a) opinion, stating broadly that the reasons given on the record for all disputed evidentiary rulings were within the court's discretion. ***See*** Trial court opinion, 5/3/2012, at pp. 5-6.

*Commonwealth v. Little*, 2556 EDA 2011, at *20 (Pa. Super. November 27, 2012) (emphasis added).

Accordingly, we disposed of the issue by finding that the lack of preservation had rendered it procedurally barred on direct appeal. *See id*. This Court did not reach the merits of Little's claim, and after his judgment of sentence was affirmed, *see id*., our Supreme Court denied Little's petition for allowance of appeal. *See Commonwealth v. Little*, 582 EAL 2012 (Pa. June 26, 2013).

## II.

## A.

Little timely filed a *pro se* PCRA petition in 2013, asserting that his life sentence was illegal under new and controlling federal law prohibiting mandatory life sentences for juvenile offenders. *See* Amended PCRA Petition, 12/7/2013, at 5-10. In 2014, Little amended his PCRA petition, adding claims of ineffective assistance of counsel. He asserted that his defense counsel failed to (1) object to the limited scope of Alston's testimony regarding potential penal consequences for his admissions to Adams' murder; (2) seek a curative instruction to improper prosecutorial comments following several sustained defense objections; and (3) adequately consult with Little prior to trial. *See* Amended PCRA Petition, 4/30/2014, at 3-4.

Little also added a claim of after-discovered evidence relating to the misconduct of an investigating officer, Detective Ronald Dove, who would

eventually plead guilty on April 25, 2017, to several offenses for tampering with the prosecution of a murder in subsequent unrelated cases. *Id*. at 4. Little filed yet another amended PCRA petition later that year, adding an after-discovered evidence claim based on the new affidavit of Steven Hassell, who averred that he saw Alston standing over Adams and shooting him. *See* Amended PCRA petition, 10/26/2014, at 26.

The final version of Little's PCRA petition was filed in 2015 with the benefit of counsel. *See* Amended PCRA Petition, 6/26/2015. This petition incorporated all of the issues raised in the earlier iterations, along with a claim of cumulative error. *See id*. Little successfully moved to supplement his claims with then-newly published federal case law on the juvenile sentencing issue in 2016. *See* Supplement to PCRA Petition, 3/7/2016, at 5-6.

On March 10, 2017, the PCRA court held a hearing on Little's PCRA claims. The sole witness at the hearing, Hassell, testified that on the day of the incident, both Adams and Alston walked past him on the sidewalk of a street, and that he was very familiar with both of them, having lived for years in the same neighborhood. *See* Transcript PCRA Hearing, 3/10/2017, at pp. 4-6. Moments later, from about two blocks away, Hassell saw Alston holding a gun and standing over Adams on the sidewalk after he had heard gunshots ring out. *See id*. at pp. 12, 14, 41-43. Hassell did not actually see Adams being shot, but he stated he was sure of Alston's identity as the shooter. *Id*. at pp. 14, 22.

Hassell did not come forward sooner about what he had seen because cooperating with the police was frowned upon in his neighborhood. *Id*. at p. 15. He did not change his mind until years later when he was incarcerated for a separate matter and learned that Little was serving time in the same facility for the murder of Adams. *Id*. at pp. 16-20, 22.[10]

About two-and-a-half years after the hearing on Little's PCRA claims had concluded, the PCRA court entered its opinion and order. The PCRA court found merit in Little's sentencing issue and ordered that he be resentenced. *See* 1925(a) Opinion, 8/23/2019, at 1.

The PCRA court denied the remaining claims of after-discovered evidence and ineffective assistance of counsel. As to Little's claim based on Hassell's testimony, the PCRA court found the witness lacked credibility, mainly because his testimony contradicted his affidavit as to how close he was to Adams and Alston at the time of the shooting. *Id*.

The PCRA court also rejected all of Little's ineffectiveness claims, finding first that defense counsel could not have been ineffective at trial for failing to renew an objection as to the limits on Alston's examination. The PCRA court

---

[10] In his testimony and affidavit, Hassell stated that a fellow inmate other than Little had encouraged him to report what he had seen, and that neither Little nor anyone else had any hand in preparing the content of his affidavit. However, Little had stated in his own affidavit submitted with his PCRA claims that he had, in fact, met with Hassell to coordinate the preparation of Hassell's affidavit.

found that it would have been futile for defense counsel to object to the restriction on questions to Alston regarding a potential death penalty in the event of his prosecution for Adams' murder, reasoning that such a result would have been extremely unlikely because the Commonwealth doubted his credibility and was unlikely to charge him. *Id*. at 7-8. The PCRA court ignored whether Alston nevertheless had reason to fear prosecution for Adams' murder based on his sworn testimony.

Further, the PCRA court found that the record precluded relief on the other ineffectiveness claims because there was no reasonable likelihood that requests for curative instructions or more pre-trial consultation between Little and his counsel would have resulted in a different outcome in light of the evidence establishing his identity as Adams' killer. *Id*. at 9-10. The PCRA court did not address Little's remaining claim of after-discovered evidence as to Detective Ronald Dove.

**B.**

Little timely appealed the order denying his claims[11] and raised six issues in his brief, only one of which we will consider in depth:

> Was [Little] denied his Sixth Amendment right to effective
> assistance of counsel when counsel agreed to and/or failed to

---

[11] Although the order on review was dated "July 19, 2018" and docketed on July 19, 2019, the order bears a date stamp of August 23, 2019. Little appealed on September 15, 2019, and since nothing in the record explains the discrepancy, Little's notice is considered to be timely filed within 30 days of the date his PCRA petition was partly denied.

renew his objection as to the scope of Alston's questioning concerning the potential consequences of his testimony thereby waiving appellate review?

Appellant's Brief, at 3.

As set forth in its briefing and application for reconsideration, the Commonwealth argues that defense counsel's failure to preserve an issue for direct appeal is, without more, insufficient to entitle Little to PCRA relief. The Commonwealth asserts that under the PCRA, a petitioner may only show prejudice from trial counsel's ineffectiveness at the trial stage and not beyond. Rather than evaluate the impact counsel's conduct had on Little's appeal, the Commonwealth insists that we must gauge prejudice by considering whether the *trial court's* restriction on Alston's examination affected the jury's verdict.

## III.

We begin our recitation of the governing law by noting that a claim of ineffective assistance of counsel is cognizable under the PCRA as an enumerated ground for relief. *See* 42 Pa.C.S. § 9543(a)(2)(ii); *see also Strickland v. Washington*, 466 U.S. 668 (1984); *Commonwealth v. Pierce*, 527 A.2d 973, 975–76 (Pa. 1987). When analyzing an ineffectiveness claim, an appellate court's focus is on the impact of *counsel's* conduct and not the rulings of a trial court that must, instead, be challenged on direct appeal. *See* Pa.C.S. §§ 9543(a)(3), 9544(a)(2).

Counsel is presumed to have provided effective representation unless the PCRA petitioner pleads and proves three prongs of ineffectiveness:

1. the underlying legal claim is of arguable merit;

2. counsel's action or inaction lacked any objectively reasonable basis designed to effectuate his client's interest; and;

3. **as a result of counsel's action or inaction, the petitioner suffered prejudice**.

*See generally Pierce*, 527 A.2d at 975-76 (emphasis added).

The PCRA court may deny an ineffectiveness claim if "the petitioner's evidence fails to meet a single one of these prongs." *Commonwealth v. Basemore*, 744 A.2d 717, 738 n.23 (Pa. 2000); *Commonwealth v. Hall*, 872 A.2d 1177, 1184 (Pa. 2005) (same).[12] Before PCRA relief is granted, all three prongs must be met.

**A.**

Little satisfies the *first prong* because his underlying evidentiary issue has arguable merit. At Little's murder trial, the Commonwealth's chief evidence of guilt was the testimony of two purported eyewitnesses who identified him as the perpetrator. The defense presented the testimony of one witness, Alston, who contradicted those witnesses by admitting to the murder himself. The jury had to acquit Little if it found Alston credible enough to raise a reasonable doubt about his guilt.

---

[12] "On appeal from the denial of PCRA relief, our standard of review calls for us to determine whether the findings of the PCRA court are supported by the record and are free from legal error." *Commonwealth v. Williams*, 980 A.2d 510, 518 (Pa. 2009).

To show that Alston faced potential adverse consequences for his testimony, defense counsel sought to question him on whether he believed he would be death-penalty eligible if charged with murdering Adams. This was critical because the Commonwealth had successfully impeached Alston's credibility by eliciting that he was serving two consecutive life sentences for unrelated cases, and he had testified as a defense witness in two other defendants' trials.

During argument on the defense's motions *in limine*, the Commonwealth also described its plan to use Alston's life sentences as evidence that he had "nothing to lose" from admitting to Adams' murder. That is, the Commonwealth was setting the stage to convince the jury that Alston would be free to give a false confession as a favor to Little, since it was supposedly impossible for Alston to incur any further punishment than had already been imposed in his other cases. In its closing argument, the Commonwealth indeed went on to discredit Alston by arguing that he could "say whatever he wants" at Little's trial with impunity. **See** Trial Transcript, 11/13/2007, at pp. 194-95.

Defense counsel recognized that the only way to refute the Commonwealth's false inference was to point out that Aston **did** have something to lose by admitting to Adams' murder. As a matter of fact and law, Alston would have indeed been exposed to the death penalty in the event

that the Commonwealth opted to charge him with the murder of Adams.[13]  In ruling that Alston's exposure to the death penalty was irrelevant, inadmissible and speculative, the trial court arguably abused its discretion by misapplying the law.

"Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." **Commonwealth v. Drumheller**, 808 A.2d 893, 904 (Pa. 2002) (citation omitted).

When a party's witness is attacked for bias or accused of having a motive to lie, counsel for that party should be allowed to respond in kind with relevant, admissible evidence that refutes the attack.  **See Commonwealth v. Griffin**, 515 A.2d 865, 872–73 (Pa. 1986) (if a witness's credibility is attacked, then counsel should be allowed to rehabilitate that witness "to rebut accusations or suggestions of fabrication or corruption.").

Pennsylvania has long recognized that a witness's admission to a crime is considered reliable and, therefore, admissible because its "trustworthiness is safeguarded by the improbability that a declarant would fabricate a

---

[13] It was established during the hearing on defense counsel's *in limine* motions that Alston was over the age of 18 when Adams' murder occurred, and that there were aggravating circumstances exposing Alston to the death penalty in the event of prosecution.  **See** 42 Pa.C.S. § 9711(d).

statement which is contrary to his own interests." ***Commonwealth v. Colon***, 337 A.2d 554, 556 (Pa. 1975); ***see also Chambers v. Mississippi***, 410 U.S. 284, 299 (1973) (it is assumed that "a person is unlikely to fabricate a statement against his own interest at the time it is made.").

Indeed, such statements are considered so "inherently trustworthy" that they are excepted from the general prohibition on hearsay at trial. ***Commonwealth v. Statum***, 769 A.2d 476, 479 (Pa. Super. 2001) (quoting ***Commonwealth v. Hackett***, 307 A.2d 334, 338 (Pa. Super 1973)). It is the mere possibility of criminal prosecution, not the likelihood of prosecution, which lends weight to an admission. ***See Statum***, 769 A.2d at 480 ("regardless of the *likelihood* of her prosecution, [the witness'] statement was obviously self-incriminatory and unquestionably against her own penal interest . . . she clearly was aware of the possibility that her disclosure would lead to criminal prosecution[.]") (Emphasis in original).

In this case, the Commonwealth suggested that Alston's confession was not truly against his penal interests because a murder prosecution would have no practical effect on him. The defense requested to rebut that speculation by showing that Alston's confession subjected him to capital punishment. As the Commonwealth's own logic implies,[14] any punishment Alston could have

---

[14] The Commonwealth argued that Alston could afford to give a false confession in exchange for favor with Little because no penal consequences would ensue. It follows from that argument that if Alston *did* face the death

- 22 -

incurred because of his trial testimony would be highly relevant. The jury could not have made an informed determination as to Alston's credibility without weighing whether Alston believed exposure to capital punishment was against his own interests.[15]

Despite the import of defense counsel's proffered examination, the trial court restricted the scope of Alston's testimony and prevented the defense from rehabilitating its only witness, whose testimony, if believed, would have completely exonerated Little. Thus, there is arguable merit in Little's underlying claim that defense counsel performed deficiently in failing to preserve the evidentiary issue for review on direct appeal.

**B.**

Next, we find that Little has satisfied the *second prong* of his ineffectiveness claim. Defense counsel had no reasonable basis for failing to make an objection sufficient to preserve the evidentiary issue once the trial court made a ruling. As this Court has already held, defense counsel thoroughly raised the issue to no avail, but then inexplicably declined to

_____

penalty, he would have less incentive to testify falsely or more reason to deny his own guilt.

[15] "Credibility involves an assessment of whether or not what the witness says is true; this is a question for the fact finder." **Commonwealth v. Delbridge**, 855 A.2d 27, 40 (Pa. 2003). "[T]he trier of fact, while passing upon the credibility of witnesses and the weight of the proof, is free to believe all, part, or none of the evidence." **Commonwealth v. Watkins**, 843 A.2d 1203, 1211 (Pa. 2003).

"reassert his objection or otherwise express any disagreement with the trial court's resolution." *See Little*, 2556 EDA 2011, at \*20.

To determine if there was a "reasonable basis," the PCRA court does "not question whether there were other more logical courses of action which counsel could have pursued; rather, [the court] must examine whether counsel's decisions had any reasonable basis." *Commonwealth v. Hanible*, 30 A.3d 426, 439 (Pa. 2011). A PCRA court may find that counsel's strategy lacked a reasonable basis if the petitioner proves that a foregone alternative "offered a potential for success substantially greater than the course actually pursued." *Commonwealth v. Bardo*, 105 A.3d 678, 684 (Pa. 2014) (quoting *Commonwealth v. Spotz*, 18 A.3d 244, 260 (Pa. 2011)).

In the present case, our evaluation is guided by our discussion in Little's direct appeal. There, we held that counsel failed to preserve the issue at hand after the trial court had already barred him from rehabilitating Alston during his examination. We held that counsel apparently opted to agree with the clearly detrimental ruling, resulting in Little's loss of an arguably meritorious issue that could have afforded him a new trial.

There was no strategic calculation on the part of defense counsel for agreeing with the trial court's ruling and making it non-reviewable on direct appeal. To the contrary, Little's defense counsel himself articulated the significance of Alston's credibility and the force of the Commonwealth's claim that Alston was, in effect, immune from further penal sanction. The only

means defense counsel had to refute the Commonwealth's untrue insinuation was to elicit from Alston and then argue to the jury that his admission exposed him to capital punishment (which it did), making Alston's decision to testify that much more credible.

Moreover, the absence of a strategy in waiving the appellate issue is evident from the behavior of defense counsel, who obviously thought he *had* done everything needed to preserve the issue for appeal. Defense counsel urged during Alston's direct, cross and re-direct examinations that Alston's exposure to capital punishment should have been fair game. Counsel also repeated those arguments prior to the Commonwealth's closing statements. Each time, the trial court found that it was "irrelevant" whether Alston knew he was death-penalty eligible. That finding was echoed in the trial court's 1925(a) opinion. *See* 1925(a) Opinion, 5/3/2012, at 5.

The defense gained no advantage from botching the one minimal step necessary to preserve the issue for direct appeal. The *only* practical outcome of that error is that, as this Court has already held, the issue was waived and could not be considered on the merits, barring Little from an appellate remedy. *See Little*, 2556 EDA 2012, at **19-20. Thus, Little easily satisfies the second prong of his ineffectiveness claim.

## C.

Last, we address the *prejudice prong* of Little's PCRA claim. To meet this prong, a petitioner must show that there is a "reasonable probability" that

the "result of the proceeding" would have been different but for counsel's action or inaction. ***Commonwealth v. King***, 57 A.3d 607, 613 (Pa. 2012) (quoting ***Strickland***, 466 U.S. at 694); ***Commonwealth v. Kimball***, 724 A.2d 326, 330-32 (Pa. 1999) (same). When considering the asserted proof of prejudice, courts should avoid "mechanical" application of the rules and instead consider the totality of the circumstances surrounding any given claim of ineffectiveness. ***Pierce***, 527 A.2d at 974-75 (quoting ***Strickland***, 466 U.S. at 696). The United States Supreme Court instructed in ***Strickland*** that fairness and reliability in the proceedings are the foundations of the prejudice inquiry:

> [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether . . . the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

***Strickland***, 466 U.S. at 696.

In this case, Little argues that defense counsel committed an error that doomed his direct appeal. Defense counsel repeatedly sought to elicit evidence that would refute the Commonwealth's suggestion that Alston had "nothing to lose" from testifying. Defense counsel then presented the grounds for why rehabilitation on that point was relevant, permissible and vital to the defense's case, but the trial court ruled that it was completely irrelevant. Though raised on direct appeal, we found that the issue had been waived

because even though it was raised, defense counsel appeared to acquiesce to the trial court's restrictions.

As the Commonwealth has emphasized as its grounds for affirmance, a PCRA petitioner alleging an ineffectiveness claim generally must show there was a reasonable probability that counsel's error resulted in a different outcome of the proceedings at the "stage where the alleged ineffectiveness took place[.]" ***Commonwealth v. Mallory***, 941 A.2d 686, 703 (Pa. 2008); ***see also Strickland***, 466 U.S. at 696 (the post-conviction inquiry concerns the fairness of "the proceeding whose result is being challenged.").

A "reasonable probability" is a degree of likelihood "sufficient to undermine confidence in the outcome of the proceedings." ***Commonwealth v. Collins***, 957 A.2d 237, 244 (Pa. 2008). This reasonable probability "test is not a stringent one," as it is "less demanding than the preponderance standard." ***Commonwealth v. Hickman***, 799 A.2d 136, 141 (Pa. Super. 2012).

**1.**

Under a "mechanical" application of the ***Strickland*** test, Little cannot show prejudice because counsel's deficient performance at trial – waiving an appellate issue – had no immediate effect on the verdict. Had counsel properly preserved Little's evidentiary issue for direct appeal, the trial would have proceeded in the exact same fashion as it did. The trial court would have still

rejected the defense's arguments and disallowed questions to Alston about whether he knew if he faced the death penalty.

In light of these circumstances, a conclusion of no prejudice would be inconsistent with **Strickland's** mandate to focus on the overall integrity of the proceedings and to avoid mechanical application of the rules.[16] Notwithstanding the appellate waiver, the trial court's error could have influenced the jury to assign less weight to evidence of exoneration than what might have otherwise been due. A further error by counsel stymied Little's ability to seek recourse on appeal.

We find no Pennsylvania authority that precludes a finding that these unique facts can constitute prejudice. While one decision in particular, **Commonwealth v. Reaves**, 923 A.2d 1119, 1131-32 (Pa. 2007), held that a waived appellate issue was not prejudicial, the opinion is distinguishable and not controlling here.

In **Reaves**, a sentence above the statutory guidelines was imposed at a probation violation hearing without the reasons being stated on the record as is required by Pa.R.Crim.P. 708. The probationer's counsel did not object at sentencing or file a motion for reconsideration on that ground. These

---

[16] If an issue is fully raised at trial yet not preserved for appeal, the deficiency in counsel's performance would not be the cause of the improper admission of the evidence; only the trial court's ruling would be. Counsel's error would not come into play until after the judgment of sentence has been entered, eliminating potential relief at the appellate stage.

omissions rendered the issue waived on direct appeal, and this Court held after subsequent PCRA proceedings that counsel's failure to object to a violation of Pa.R.Crim.P. 708 was prejudicial *per se*, warranting relief. **See Commonwealth v. Reaves**, 863 A.2d 1230 (Pa. Super. 2004) (unpublished memorandum).

This decision was reversed because an incorrect prejudice standard had been applied. **See Reaves**, 923 A.2d at 1128-32. Our Supreme Court reasoned that we had conflated the loss of a single appellate issue with the complete loss of the right to appeal. The petitioner in **Reaves** had to show that not only had his counsel failed to object to a sentencing error, but that there was a "factual predicate" in the record demonstrating that *actual* prejudice resulted: "Whether VOP counsel can be deemed ineffective, then, depends on whether appellee has proven that a motion to reconsider sentence, if filed . . . would have led to a different and more favorable outcome at VOP sentencing." **Id**. at 1131-32.

The Court held that the record was not developed enough to show actual prejudice because there was no indication that counsel's omission at sentencing could have resulted in a harsher sentence. **Id**. at 1132.[17] In other

---

[17] The sentencing court in **Reaves** further undermined the prejudice claim by stating in the 1925(a) opinion that the probationer would have ultimately received the same sentence had his counsel timely objected to the violation of Pa.R.Crim.P. 708. **See Reaves**, 923 A.2d at 1132.

words, actual prejudice at the appellate stage could not be presumed in the absence of a record showing that the sentence would have been reduced had counsel made a proper objection to the sentencing court's error. *See id*.

The instant case is different because nothing is speculative or presumed with respect to counsel's objections, the trial court's ruling, the jury's verdict, or the effect of the waiver. Unlike the sentencing court in *Reaves*, the trial court here gave a fully reasoned adverse ruling that resulted in the exclusion of evidence Little had sought to admit. The issue was waived on direct appeal not due to an omission, but rather because counsel said "very well" after the trial court had already rejected the opportunity to correct the stated error.

Together, the objection, the ruling, the verdict and appellate waiver allow Little to identify the factual predicate that links counsel's conduct with a concrete harm that manifested for the first time on appeal. Since this actual prejudice is evident in the record and not speculative, *Reaves* does not bar Little's claim.

**2.**

While no Pennsylvania case squarely addresses whether the type of actual prejudice Little can show is sufficient for a PCRA claim, some federal jurisdictions have recognized that counsel's waiver of an appellate issue (after

an objection and issuance of an adverse ruling) *can* be prejudicial for post-conviction purposes.[18]

In ***Davis v. Secretary for Dept. of Corrections***, 341 F.3d 1310 (11th. Cir. 2003), the Eleventh Circuit Court of Appeals found prejudice due to such a waiver and confined the scope of its holding to a limited set of facts. The petitioner in ***Davis*** had been on trial for murder and burglary, and during *voir dire*, his counsel made meritorious ***Batson*** challenges[19] to the prosecution's improper striking of black venire members. The trial court overruled the objection to the strikes, but counsel did not renew the challenge prior to the empaneling of the jury, as would be required to preserve the issue for appellate review under the applicable state law. ***See Davis***, 341 F.3d at 1314.

The ***Davis*** petitioner was found guilty, and when he raised the ***Batson*** issue on direct appeal, the court found it waived and affirmed his convictions. ***Id***. at 1312. The petitioner then sought recourse at the post-conviction stage, arguing that his defense counsel's performance was deficient due to failing to preserve an issue for appeal that would have afforded him relief. ***Id***. His claim was denied on the ground that counsel's error did not result in a different

---

[18] Decisions of federal circuit courts are not binding, but may be given persuasive effect by courts of this Commonwealth. ***See In re Stevenson***, 40 A.3d 1212, 1221 (Pa. 2012).

[19] ***See Batson v. Kentucky***, 476 U.S. 79 (1986).

outcome at trial since the issue was fully raised and litigated, albeit not cognizable on appeal due to counsel's error. *Id*.

The Eleventh Circuit then considered whether post-conviction relief would be available when the asserted error by defense counsel concerns the "failure in his separate and district role of preserving error for appeal," and "the only possible impact is on the appeal." *Id*. at 1316. The court held that "when a defendant raises the unusual claim that defense counsel, while efficacious in raising an issue, nonetheless failed to preserve it for appeal, the appropriate prejudice inquiry asks whether there is a reasonable likelihood of a more favorable outcome on appeal had the claim been preserved." *Id*. at 1316.

Based on the applicable standard of review for **Batson** claims, the **Davis** court found there was a reasonable probability that had the issue been preserved for direct appeal, Davis' convictions would have been vacated, establishing prejudice for post-conviction purposes. *Id*. To remedy that harm, the court directed that he would be entitled to relief on remand, in the form of either a new trial or the ability to reassert the waived claim in a "freestanding" direct appeal, *nunc pro tunc*. *Id*. at 1317.

The Eleventh Circuit later clarified that it had only created a "razor thin" exception, intended to be applicable in unusual situations when the "failure of counsel was solely in his role as appellate counsel at trial[.]" **Purvis v. Crosby**, 451 F.3d 734, 739 (11th Cir. 2006). The court stressed that the

holding of **Davis** was drawn narrowly, and that in the more usual cases where an issue was simply not raised at all, the resulting appellate waiver would not satisfy **Strickland's** prejudice standard for ineffectiveness. **See id**. at 740.[20] **Davis** remains good law in the Eleventh Circuit. **See U.S. v. Thompson**, 463 Fed. Appx. 887, 890 n.3. (11th Cir. 2012) (unpublished opinion recognizing continuing vitality of **Davis'** narrow holding).

**3.**

This appeal involves the same set of novel and narrow circumstances that warranted a finding of prejudice in **Davis**. Little's defense counsel objected and received an adverse ruling at trial, but then for reasons unrelated to trial representation, waived a claim for Little's direct appeal. Had the issue been preserved, nothing at trial would have changed because the subject error would still have gone uncorrected.

The only difference would be that on direct appeal, we would have been able to consider whether the trial court abused its discretion by barring defense counsel from asking Alston if he believed his confession to murder could subject him to the death penalty. If the trial court were found to have

---

[20] This is because in the more common situation where counsel completely fails to object to an impropriety at trial, it is possible for a PCRA petitioner to articulate how counsel's conduct directly affected the verdict at the *trial stage*.

abused its discretion, the Commonwealth would then have had to establish beyond a reasonable doubt that the trial court's error was harmless.[21]

In that hypothetical analysis, this Court on direct appeal would have had to consider that Little's trial was essentially a credibility contest between Alston and the Commonwealth's two eyewitnesses, both of whom gave wildly different accounts of the shooting. The limitation on Alston's testimony indisputably had a significant bearing on whether the jury considered his admission as against penal interest, a factor that weighs heavily on the scales of credibility. Without the benefit of that pertinent consideration, the jury could not have fairly resolved perhaps the most important disputed issue of fact in the entire trial.

In cases where the fact-finder must necessarily make a credibility determination as to a pivotal witness, the erroneous exclusion of evidence pertaining to the witness' credibility may be found prejudicial and not harmless beyond a reasonable doubt. *See e.g., Commonwealth v. Story*, 383 A.2d 155, 168-69 (Pa. 1978) (reversing murder conviction where jury heard irrelevant and inflammatory evidence of victim's family life, which could have

_____

[21] On direct appeal from a judgment of sentence, the Commonwealth must prove that trial court error is harmless beyond a reasonable doubt. *See generally Commonwealth v. Story*, 383 A.2d 155, 162 (Pa. 1978). When the evidence of a defendant's guilt is not "overwhelming" and there are conflicts in the evidence of guilt, the error it not harmless. *See id*. at 167-68.

swayed its critical credibility determinations); ***Commonwealth v. Palmore***, 195 A.3d 291 (Pa. Super. 2018) (finding that exclusion of evidence pertaining to victim's credibility, which went to "the core" of the defense, was not harmless).

There is a reasonable probability, then, that Little could have prevailed on this issue in his direct appeal but for his defense counsel's ineffectiveness in waiving it. It was impossible for Little to articulate his harm in any other way because it manifested on appeal, but it is a real and well-defined harm that can and should be recognized as actual prejudice under the PCRA. Thus, we find that Little met the prejudice prong of his PCRA claim in this rare and unlikely situation where (1) trial counsel properly objected to an evidentiary error, (2) counsel obtained an adverse ruling, and (3) counsel then acted gratuitously in a quasi-appellate capacity, resulting in the total waiver of (4) an otherwise preserved appellate issue that was (5) reasonably likely to be meritorious.

**IV.**

**A.**

To the extent that we have not already addressed the concerns raised in the Commonwealth's application for reconsideration, we write now to briefly dispose of them. In short, the Commonwealth has argued that:

- ***Davis*** is inconsistent with Pennsylvania law because the roles of defense counsel and appellate counsel cannot be conflated for the purposes of the PCRA;

- *Davis* is universally disfavored in other jurisdictions; and

- PCRA prejudice must be shown at stage where error occurs, requiring Little to prove that his trial outcome would have been different had the questioning of Alston not been curtailed.

In response to these concerns, we emphasize that the applicability of the narrow *Davis* exception is a matter of first impression in Pennsylvania. The decision cannot conflict with any established Pennsylvania law because the particular issue has never been previously decided.

While we are mindful that some courts in other jurisdictions have been critical of *Davis*, we also note that, contrary to what the Commonwealth contends, several courts throughout the country have cited to it approvingly.[22]

_____

[22] *See e.g., Brewer v. Taylor*, 2017 WL 1160573, at *2 (D. Or. Mar. 28, 2017) (granting post-conviction relief on *Davis* grounds and overturning denial of relief because "[t]he proper inquiry should have been whether there was a reasonable likelihood that Petitioner would have prevailed on appeal."); *Shaw v. Dwyer*, 555 F. Supp. 2d 1000, 1010 (E.D. Mo. 2008) (citing approvingly to *Davis* and granting post-conviction relief where trial counsel's error resulted in a loss of a meritorious appeal, explaining that "[t]o require petitioner to show an effect upon his trial in order to establish prejudice is … factually impossible[.]"); *see also Burdge v. Belleque*, 2008 WL 3853445, at *5 (9th Cir. Aug. 15, 2008) (holding that trial counsel's failure to preserve a sentencing issue for appeal under Oregon law prejudiced petitioner because the outcome would have been different on appeal); *Patterson v. Lewis*, 2018 WL 4941120, at *11 (D.S.C. June 21, 2018), *report and recommendation adopted*, 2018 WL 4524093 (D.S.C. Sept. 13, 2018) (citing *Davis* for proposition that "to show prejudice from counsel's failure to preserve an issue for appellate review, the petitioner must show the outcome of his appeal would have been different."); *Kohn v. Cain*, 2016 WL 1564138, at *7 (W.D. La. Jan. 14, 2016), *report and recommendation adopted*, 2016 WL 1546783 (W.D. La. Apr. 14, 2016) (citing *Davis* for proposition that "[f]ailing to preserve a claim for appeal after otherwise raising it effectively rises to the level of deficient performance" of trial counsel).

However, more importantly, we find **Davis'** reasoning to be persuasive, especially because it allows us to remedy ineffectiveness of counsel that possibly deprived Little of his right to a fair trial.

The Commonwealth objects that this Court's approach would confuse the PCRA prejudice standard for claims of ineffective trial and appellate counsel. However, the narrow exception drawn here is only one of *many* instances where a Pennsylvania court has recognized that trial counsel's conduct caused PCRA prejudice at the appellate stage. **See e.g., Commonwealth v. Green**, 168 A.3d 173, 176 (Pa. Super. 2017) (quoting **Roe v. Flores-Ortega**, 528 U.S. 470 (2000)) (trial counsel may be found ineffective for failing to file a notice of appeal or to consult with defendant about preservation of "nonfrivolous grounds for appeal"); **Commonwealth v. Brundage**, 3549 EDA 2017 (Pa. Super. June 26, 2018) (same).

Allowing Little to prevail on his ineffectiveness claim also comports with Pennsylvania law because the burden remained on him to prove all three prongs enumerated in the PCRA. We have reviewed the underlying merit of his claim, considered whether his counsel's conduct was objectively reasonable, and determined whether counsel's action or inaction was reasonably likely to affect the outcome of the proceedings, albeit at the appellate stage. **See Pierce**, 527 A.2d at 975-76 (enumerating elements of PCRA ineffectiveness claims). Under the peculiar circumstances of this case, Little carried his burden of proving those three prongs.

In a final effort to persuade this Court otherwise, the Commonwealth proposes an alternative test for prejudice in which Little must prove a different *trial* result had the disputed areas of examination been permitted by the trial court. This proposed alternative misses the mark because, by definition, a claim of ineffective assistance of counsel relates to the conduct of *counsel*, not a ruling by a court to which counsel has objected. **See generally Commonwealth v. Spotz**, 18 A.3d 244 (Pa. 2011); **see also** Pa.C.S. §§ 9543(a)(3), 9544(a)(2).

Insofar as the trial was concerned, it was purely the court's ruling that resulted in the restriction of Alston's examination. No act or omission by counsel caused it, making it factually impossible for Little to connect counsel's performance to the evidentiary ruling and final trial verdict. PCRA relief cannot be awarded on ineffectiveness grounds where prejudice occurs independently of counsel's action; this would be our role on direct appeal in the evaluation of whether the trial court committed reversible error. Because the Commonwealth's proposed test for prejudice offers little in the way of equity or consistency with established law, we must decline to apply it here.

**B.**

As our analysis is limited to whether defense counsel's error was reasonably likely to affect the outcome of Little's appellate proceedings, we stress that we have *not* held that Little would have necessarily prevailed on direct appeal had his evidentiary issued been preserved. Indeed, such a

holding would be beyond our authority because on review of the denial of PCRA relief, this Court has no jurisdiction to rule on the merits of a pure claim of trial court error. *See* 42 Pa.C.S. §§ 9543(a), 9544(a)(2).

Having found that defense counsel was ineffective, we must reverse in part the PCRA court's order as to Little's claim of ineffectiveness. On remand, Little is granted leave to file a notice of appeal, *nunc pro tunc*, with this Court within 30 days from the date of this opinion's publication. In this prospective appeal, Little may only raise and brief the *single* appellate claim he had previously lost – that the trial court abused its discretion in restricting Alston's examination. This remedial measure restores Little to the position he was in at the time of defense counsel's ineffectiveness. ***See Commonwealth v. Koehler***, 229 A.3d 915, 931 (Pa. 2020) ("An award of *nunc pro tunc* relief is intended to put the petitioner in the same position he or she was in just prior to the alleged constitutional deprivation.").

Order reversed in part and affirmed in part. Jurisdiction relinquished. Case remanded for further proceedings consistent with this opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/15/21