J-A30005-18

2019 PA Super 137

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| AL-TARIQ SHARIF ALI BYRD | : | No. 468 WDA 2017 |

Appeal from the Order March 20, 2017
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0014138-2016

BEFORE:   SHOGAN, J., KUNSELMAN, J., and STRASSBURGER*, J.

OPINION BY SHOGAN, J.:                    **FILED APRIL 29, 2019**

Appellant, the Commonwealth of Pennsylvania ("the Commonwealth"), appeals from the order entered on March 20, 2017, granting a mistrial and dismissing with prejudice the charge of persons not to possess a firearm[1] filed against Al-Tariq Sharif Ali Byrd ("Appellee").  After careful review, we affirm the trial court's order.

The trial court noted that Appellee was originally charged at CP-02-CR-2875-2015 with multiple drug and firearm-related crimes, and at CP-02-CR-3369-2016 with numerous additional offenses including rape of an unconscious victim.  Trial Court Opinion, 6/29/17, at 1-2.  Appellee filed motions to suppress at both docket numbers.  *Id.* at 2.  The trial court granted

_____

[1] 18 Pa.C.S. § 6105(a)(1).

_____

*   Retired Senior Judge assigned to the Superior Court.

the suppression motions, and the Commonwealth appealed.[2]  *Id.*  In light of the Commonwealth's appeals, Appellant's charge of persons not to possess a firearm at CP-02-CR-2875-2015, which was not impacted by the suppression motions, was severed.  *Id.*  The persons not to possess a firearm charge was re-captioned at trial court docket number CP-02-CR-14138-2016, which is the case currently before us.  *Id.*  Trial began on November 28, 2016, and while the trial was proceeding, the trial court noted that the following events occurred:

> In the early morning hours of December 1, 2016, this Court received an email message containing a voice recording from Brandy Wilson, who was set to testify as a character witness for [Appellee], indicating that she had been threatened by Assistant District Attorney Lawrence Sachs, Esquire. After a hearing outside the presence of the jury on December 1, 2016, this Court declared a mistrial *sua sponte* on the basis of manifest necessity due to ADA Sachs' prosecutorial misconduct. Following subsequent hearings on February 13 and March 20, 2017, which included testimony from Ms. Wilson reading ADA Sachs' threats, this Court dismissed the charge with prejudice. This appeal followed.

*Id.* at 2-3.  Both the trial court and the Commonwealth complied with Pa.R.A.P. 1925.

On appeal, the Commonwealth presents the following issue for this Court's consideration: "Whether the trial court erred in finding that prosecutorial misconduct necessitated the granting of a mistrial and in

---

[2] The Commonwealth's appeals were assigned Superior Court docket numbers 1817 WDA 2016 and 1818 WDA 2016, and they have no bearing on the case at bar.

dismissing the charges?" Commonwealth's Brief at 9. Initially, we point out that the Commonwealth is not appealing the grant of a mistrial; rather, the Commonwealth challenges only the finding of prosecutorial misconduct that resulted in the trial court dismissing the charges and preventing retrial on double jeopardy grounds. Commonwealth's Brief at 17-18.

Our standard of review is well settled. An appeal based on double jeopardy grounds presents a question of constitutional law. *Commonwealth v. Vargas*, 947 A.2d 777, 780 (Pa. Super. 2008) (citations omitted). As with all questions of pure law, our standard of review is *de novo* and our scope of review is plenary. *Id.* We must also consider the following:

> The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Article 1, § 10 of the Pennsylvania Constitution protect a defendant from repeated criminal prosecutions for the same offense. Ordinarily, the law permits retrial when the defendant successfully moves for mistrial. If, however, the prosecution engages in certain forms of intentional misconduct, the Double Jeopardy Clause bars retrial. Article I, § 10, which our Supreme Court has construed more broadly than its federal counterpart, bars retrial not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial. An error by a prosecutor does not deprive the defendant of a fair trial. However, where the prosecutor's conduct changes from mere error to intentionally subverting the court process, then a fair trial is denied.

*Commonwealth v. Adams*, 177 A.3d 359, 371 (Pa. Super. 2017). "[D]ismissal is an appropriate remedy in such a case because a mistrial would be an inadequate remedy for systematic intentional prosecutorial misconduct[.]" *Id.*

- 3 -

> By and large, most forms of undue prejudice caused by inadvertent prosecutorial error or misconduct can be remedied in individual cases by retrial. Intentional prosecutorial misconduct, on the other hand, raises systematic concerns beyond a specific individual's right to a fair trial that are left unaddressed by retrial. As this Court has often repeated, "a fair trial is not simply a lofty goal, it is a constitutional mandate, ... and where that constitutional mandate is ignored by the Commonwealth, we cannot simply turn a blind eye and give the Commonwealth another opportunity."

*Id.* (quoting *Commonwealth v. Graham*, 109 A.3d 733, 736 (Pa. Super. 2015) (additional citations omitted). In sum, conduct that constitutes mere prosecutorial error does not implicate double jeopardy; it is prosecutorial overreaching that cannot be condoned. *Commonwealth v. Martorano*, 741 A.2d 1221, 1222 (Pa. 1999).

In the instant case, the Commonwealth avers that the trial court failed to discern the distinction between prosecutorial error and prosecutorial overreaching. Commonwealth's Brief at 22. After reviewing the transcript of the telephone call from Ms. Brandy Wilson, a potential witness, the notes of testimony, and the trial court's rationale for dismissing the charge against Appellee, we disagree with the Commonwealth's assessment.

It is undisputed that on the evening of the third day of the trial, Assistant District Attorney Lawrence Sachs contacted Ms. Wilson, who was a potential character witness for Appellee. In a voicemail sent to the trial court in the early morning of December 1, 2016, Ms. Wilson informed the trial court that Attorney Sachs had contacted her, and she provided detail of this

conversation.  At a hearing outside the presence of the jury, Ms. Wilson's

voicemail to the court was played.  Ms. Wilson's voicemail was transcribed at

the December 1, 2016 hearing, and provides, in relevant part, as follows:

> MS. WILSON: This is Brandy Wilson.  I am recording this due to the fact that I am not willing to participate in the trial of the Commonwealth of Pennsylvania versus [Appellee].
>
> * * *
>
> During the phone conversation [with Attorney Sachs] I advised him that -- the same information that I was provided. That I was contacted, that I didn't confirm anything yet.
>
> I'm actually pretty freaked out that he was calling me since he was, you know, the ADA. I advised him that because I'm a new employee that I couldn't come in because of the simple fact that I was going to get fired. I said that if I needed to come in, in order for me to come in that I would need subpoenaed.
>
> [Attorney Sachs] proceeded to basically scare me to the point where I do not want to participate in this trial. I am not sure what to believe at this point. I have a bad feeling about the whole situation simply because I do not want any type of repercussions against me because of my participation in the trial.
>
> [Attorney Sachs] advised me that he feels – that he feels that [Appellee] is the most dangerous man that he has ever met or ever seen. He asked me if I knew how or why he was in jail up in Ohio. I said that as far as I knew it was drug related, but I said that I believe that everybody deserves a second chance.
>
> [Attorney Sachs] proceeded to tell me that the situation was an armed -- an aggravated kidnap and an armed robbery that him and other people were involved with, you know.  I might not be saying this completely accurate.
>
> As far as I can remember, [Attorney Sachs] went into very big details about the cases saying that [Appellee] had duct-taped a man up and kidnapped him, and basically interrogated him until they got the information that they wanted, and went to another location and robbed the place, armed robbery, and then

proceeded to tell me that he was also a murderer involved in a shooting in Duquesne that led to the death of three people.

Obviously, not knowing anything about it freaked me out. Not knowing who to believe in this case, I advised Mr. Sachs that, you know, I wanted our conversation to stay between me and him simply because at this point I was really freaked out.

I advised [Attorney Sachs] that I only knew [Appellee] for a few months before he got re-incarcerated. [Attorney Sachs] cut me off and was like, yeah, I know a lot about you. [Attorney Sachs] talked about the fact of my financial hardship, about a break-up, and told me that he knows a lot more about me than he should, which really freaks me out because that means I'm being watched at this point just for being in contact with [Appellee].

\* \* \*

For me I'm just scared of any type of retaliation. I don't want -- you know, corruption can be on all levels. Me not knowing the history of ADA Sachs and the fact that I'm being watched and my children are being watched really freaks me out.

You know, [Attorney Sachs] did say to me that, you know, he feels that I'm a good person, which I believe I am. I believe I am a model citizen. I am 32 years old with three children. I'm a single mother.  I work hard. I provide for my children.  I abide by the laws. My record is completely clean. I have traffic violations. That is it.

If anything happened to me, my children would be split into different homes, and my well-being and the well-being of my children outweighs anybody in my life. Friend, family or foe. I will protect me and my children over anybody in this world.

So me being scared of the situation I don't want to be part of it. You hear about corruption all the time with the DEA's Office, ADA's Office, police officers.

You know, I do believe that the majority of people who are in power who are public servants are good. But you still have those people who are not. You never know.

So I'm just fearful that -- excuse me -- that if I participate as a character witness that anything could happen. You know, something could be planted on me. I could get pulled over for complete bullcrap. That is not something that I'm willing to risk for anybody.

So I wanted to put this on record with Judge [McDaniel or her staff]. I want to put this on record simply because if something happens to me in the future, I want it to be documented of this current situation because at this point I am very fearful for my safety, the safety of my children, my family, my friends, all because of me being associated with somebody who's incarcerated. It seems like to me the ADA's Office is desperately trying to continue to have [Appellee] incarcerated for life.

So I just don't want to take that risk. If there's anything that you need from me as far as verbal communication, like over the phone or through emails, I don't have a problem with that, with it being directly with Judge McDaniel[] and [her staff].

As long as it is documented about the conversation that I had today with Mr. Sachs. I feel that that's wrong. The whole situation, calling me, scaring me into not coming. Even if I was subpoenaed I wouldn't want to be there.

I feel like the information that I was given about [Appellee] shouldn't have been given to me by him. Whether he was trying to make it seem like to scare me to, you know, make his character – make [Appellee] look threatening towards me, making me feel that I can't trust him or, you know, being fearful of what he could do to me or my children. I don't know if that's what Mr. Sachs was trying to do, but whatever he was trying to do it worked because I am not trying to participate whatsoever.

So if you choose to email me back and let me know that you got this recording so then that way I could put this on record for my safety and the safety of my children.

I'm not sure -- if there's anything else that I forgot to say I will do another recording, but I believe I covered everything. Like I said, you can respond back to me through the email.

I appreciate your time and listening to this recording and documenting the events that have occurred today.

Thank you.

N.T., 12/1/16, at 4-12 (internal quotation marks omitted).

After Ms. Wilson's voicemail was played for the court, Assistant District Attorney Streily questioned Attorney Sachs on the record, and Appellee's stand-by counsel, Brandon Herring, Esquire, conducted cross-examination. The notes of testimony provide, in relevant part, as follows:

[By Attorney Streily] Q. Mr. Sachs, when did you first become aware of the existence of [Ms.] Wilson?

[By Attorney Sachs] A. Some time around February of this year, 2016. It would have been late February.

Q. How did you become aware of her existence or relation to Mr. Byrd?

A. There was an inquiry from the Duquesne Police Department regarding this case, which caused us to look into [Appellee's] jail telephone calls and visits. As a result of listening to telephone calls, I became aware of [Ms.] Wilson.

Q. During those telephone calls I'm assuming you learned information about [Ms.] Wilson?

A. Yes.

Q. From the discussions that she had with [Appellee]?

A. Yes.

Q. In this trial at some point you became aware that [Appellee] wanted to call [Ms.] Wilson as a character witness?

A. Yesterday during the course of trial. I believe it was before lunch yesterday.

Q. Okay. As a result of learning of that, what did you do?

A. Once Court had recessed -- well, there was an attempt made, apparently, to contact her, but the phone number was no good. Eventually another phone number was provided to the Court by [Appellee], and through the course of the afternoon apparently [Ms. Wilson] was contacted, and the Court staff indicated that she would be able -- [Ms.] Wilson would be able to be here this morning.

Q. Okay. Sir, once you learned that did you make a decision as to whether to contact [Ms.] Wilson?

A. Yes. Once Court recessed for the day, some time between four and five o'clock, I know it wasn't as late as five, but I had the phone number for her from the most recent jail telephone calls that we had which wouldn't – I don't think they would have been any later than March of this year. So I used that phone number that we had to try and contact her.

Q. Using the phone number that you had obtained you made the call to [Ms.] Wilson; correct?

A. Yes.

Q. Sir, what was your intent in making that phone call?

A. My intent was to determine what basis she had to be able to testify as a character witness for [Appellee] because I had known from all recordings I have listened to she hadn't known him that long. It didn't appear that she had a lot of contact with anybody who would be within his circle other than his mother and perhaps his brother.

I wanted to know if she was aware of what his prior convictions were and whether that would change her opinion of his reputation. That was the essence of why I was calling her.

Also, I meant to find out whether she was, in fact, going to appear. Almost – the conversation only lasted two or three minutes. She indicated in fairly short order that she wasn't going to appear. Then the rest of the conversation was merely to ask her these questions and find out what she knew in case she had changed her mind or her circumstance had changed.

Q. Now, you indicated earlier in conversation she said she was not going to appear. Did she tell you why she was not going to appear?

A. She said that she couldn't get off work, and she couldn't afford to lose her job. It was a new job for her.

Q. Sir, what was your belief as to the character trait of [Appellee] that she was going to testify to?

A. Honestly, I'm not certain what she was supposed to testify to, whether it was for his honesty or his peaceable nature in the community. Because this case, although it's a gun charge, but there is a lot of testimony about what generated the police response, which was a terroristic threats situation.

So I wasn't certain exactly what she would testify to. I wanted to find out what her basis was.

Q. Did you disclose to her during that conversation any information about your belief as to past activity of [Appellee] that might have been of a criminal or violent nature?

A. Yes. I asked her if she was aware of the circumstances of his Ohio conviction. She told me that he had told her that it was a drug-related case, and I explained what the charges were, what he was convicted of.

I explained that he had been convicted of an aggravated assault in Duquesne. I think she must have been confused that there were three people killed. He did three years is what I told her. Somehow that morphed into three people being killed.

Q. Today, sir, did you tell her that he had murdered three people?

A. No.

Q. What was your tone of voice, Mr. Sachs, during this conversation?

A. Conversational. It was conversational. It was pleasant. I explained to her who I was as soon as she picked up and went from there.

Q. Did her responses to you, did they indicate any apprehension on her part in speaking with you?

A. She had indicated to me very early on -- like I said, the conversation only went like two or maybe three minutes. But she had indicated to me that she wasn't coming, that she was getting a bad feeling about this, and she wasn't going to come because of her job.

Q. Mr. Sachs, during that was it ever your intent to intimidate her from coming to be a witness for [Appellee] here today?

A. Not at all.

Q. Did you raise your voice at all during that conversation?

A. No.

Q. Again, you're telling the Court you made that conversation in order to have knowledge as to her ability to be -- actually be a proper character witness for [Appellee]?

A. Yes.

* * *

MR. STREILY: I don't have any more questions for Mr.Sachs.

THE COURT: [Appellee], you are representing yourself. Would you like to ask Mr. Sachs any questions?

[Appellee]: Your Honor, at this time I would like to request that the Court allow me the opportunity to have [stand-by counsel] Mr. Herring represent me with regards to this particular hearing and let him ask Mr. Sachs some questions.

THE COURT: Thank you, [Appellee]. Mr. Herring.

CROSS-EXAMINATION

BY MR. HERRING:

Q. Mr. Sachs, you were obviously present in the courtroom while that recording was played; correct?

A. Yes.

Q. The witness indicated on that recording that you had informed her that [Appellee] was one of the most dangerous people that you had ever met or something to that effect. Correct?

A. Yes.

Q. Did you, in fact, say that to her?

A. Yes.

Q. What was the legitimate purpose of telling her that in relation to her coming to Court and being a witness?

A. We were discussing him, and she had already indicated that she wasn't planning on coming, and we were just having a conversation at that point.

Q. We can agree that you wouldn't have been permitted to ask her a question related to your opinion of [Appellee] during the course of the trial; correct?

A. Absolutely.

Q. So there was no - -

A. Yes. I agree.

Q. So there was no legitimate purpose for editorializing to her your opinion of [Appellee] while you were contacting her about being a character witness; correct?

A. I wouldn't necessarily agree with that, that it was not legitimate. It was a conversation about him.

Q. [Ms. Wilson] also referenced a homicide in Duquesne. Did you mention any homicide charges that had been previously brought against [Appellee]?

A. I don't recall mentioning that. I told her that he did three years for a shooting in Duquesne.

Q. It's your opinion that she had misinterpreted that to be three homicides in Duquesne?

A. Yes. I mean, as far as I know, there are not three homicides in Duquesne associated with [Appellee].

Q. Mr. Sachs, in that recording, [Ms. Wilson], despite having been told by you that [Appellee] had all of these convictions, but I believe it was your conduct that was going to be directed towards her in relation to knowing about her family.

Did you reference the jail recordings that you had listened to in relation to [Appellee's] case?

A. I believe I told her that that's how I -- why I knew about her, what I knew about her.

I mean I never told her that she was under surveillance. She wasn't under surveillance. Everything I know about her is from having had to listen to these jail recordings.

Q. But you had, in fact, told her several things about her family, and you told her that you knew more information about her than you should? Did you say that to her?

A. In response to when she was telling me about herself, I said, yes, I know about these things. I know about this. I know about that. It was all as a result of listening to these recordings. That's why I know more about her than I should.

Q. You did, in fact, use those words in speaking with the witness?

A. Yes. I believe I did. Yes.

MR. HERRING: Your Honor, I have no more questions of the witness.

Thank you.

THE COURT: You may step down.

I find [Ms. Wilson], although not cross-examined, to have been well spoken and articulate.

- 13 -

I see no legitimate reason Mr. Sachs would tell her about the details of the Ohio case. He said that he knew more about her than he should.

I find it hard to believe that she said that she had financial problems and a recent break-up. I believe that Mr. Sachs told her that.

I believe that he told her that [Appellee] shot people in Duquesne. He said that he was dangerous.

I believe that it's the perception of the witness in this case that matters, and her perception is that Mr. Sachs and/or the D.A.'s Office is corrupt, possibly she was afraid for her life and for her children, and the witness has not appeared. For manifest necessity I am going to declare a mistrial in this case.

I have been on the bench for 31 years. In that 31 years I have never once banned anyone from my courtroom …. However, Mr. Sachs, you are banned from my courtroom. I can no longer trust you. I find you to be sneaky. I find you to be able to backdoor people, and you're not allowed in my courtroom.

Thank you.

N.T., 12/1/16, at 16-26.

After review, we agree with the trial court that the Commonwealth, through the actions of Attorney Sachs, intimidated Ms. Wilson to prevent her from testifying with the intent of depriving Appellee a fair trial. Trial Court Opinion, 6/29/17, at 11, 12-13. Attorney Sachs questioned Ms. Wilson regarding her knowledge of Appellee, informed Ms. Wilson about prior criminal acts that Appellee allegedly committed, editorialized about Appellee's dangerous propensity, and informed Ms. Wilson that he was aware of many details about her life. Attorney Sachs's statements placed Ms. Wilson in fear for her own safety and for that of her family. We cannot conclude that

- 14 -

Attorney Sachs's actions were mere prosecutorial error; rather, they were intentional acts of prosecutorial overreaching implicating double jeopardy protection. *Martorano*, 741 A.2d at 1222. Because we conclude that the Commonwealth's misconduct was intended to deprive Appellee of a fair trial, we agree that retrial is barred and that the charge against Appellee at trial court docket number CP-02-CR-0014138-2016 was properly dismissed. *Adams*, 177 A.3d at 371. Accordingly, we affirm the March 20, 2017 order dismissing this case with prejudice.

Order affirmed.

Judge Kunselman joins this Opinion.

Judge Strassburger files a Dissenting Opinion.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/29/2019