J-A21019-21

2021 PA Super 243

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
Appellant :
:
:
:
v. :
:
:
:
JEROME KING : No. 1812 EDA 2020

Appeal from the Order Entered August 25, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0706191-2005

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
Appellant :
:
:
:
v. :
:
:
:
ESHEEM HASKINS : No. 1813 EDA 2020

Appeal from the Order Entered August 25, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0706192-2005

BEFORE:   KUNSELMAN, J., NICHOLS, J., and KING, J.

OPINION BY NICHOLS, J.:                    **FILED DECEMBER 14, 2021**

In these consolidated cases,[1] the Commonwealth appeals from the
August 25, 2020 order granting the motion to dismiss and bar retrial filed by
Jerome King and Esheem Haskins (collectively Appellees).    The
Commonwealth asserts that although the prosecutor in this matter committed
an error prior to trial, the remedy should be a new trial rather than dismissal

---

[1] In an order filed on August 6, 2021, we consolidated these appeals *sua sponte*.

of the charges based on double jeopardy. After review, we reverse the order dismissing the charges against Appellees based on double jeopardy and remand for a new trial.

The trial court summarized the relevant facts and procedural history underlying the instant appeals as follows:

On February 2, 2005, Nathaniel Giles (Giles) was shot to death outside of a Chinese restaurant in Philadelphia, PA. At the time, Giles was cooperating with federal authorities in the murder investigation of ten-year[-]old Faheem Thomas-Childs (Thomas-Childs). Giles told federal authorities that the gun used in Thomas-Childs' murder was purchased from Jerome King (King). Two civilians, minors at the time, witnessed Giles' murder outside of the restaurant.

The eyewitnesses were inside of the restaurant waiting for their food order when they saw Giles engaged in a conversation with Khalief Alston (Alston) just outside the restaurant. While Giles and Alston talked, a car stopped for an unusually long time at the stop sign by the restaurant then drove away. A short time later, two men approached Giles from the direction the car had driven and one of the men [put] a gun to the back of Giles' head and shot him. The shooter stood over [Giles'] body and shot Giles again before the two men fled.

The eyewitnesses consistently identified King as the shooter and Esheem Haskins (Haskins) as the accomplice in photo arrays during the investigation and at trial. During the June 2006 trial, some of the eyewitnesses' testimony was inconsistent with their police statements and inconsistent with each other. One witness did not mention an accomplice in the police statement and described the shooter as six feet to six feet and three inches tall, while King is only five feet and seven inches tall. This witness denied providing detectives with the shooter's height.

The other witness testified to watching Haskins hand a gun to King as they approached Giles but later changed her testimony denying she witnessed that interaction. This witness also changed her testimony that she heard Haskins yell "Shoot him. Shoot him," to

King, instead claiming that she could not hear what was being said outside of the restaurant.

On March 11, 2005, Khalief Alston and Ernest Cannon (Cannon) were arrested for an unrelated homicide. The same day, Alston gave a statement (March 11 statement) to police regarding the unrelated murder, implicating Cannon as the murderer in that matter. Cannon also gave a statement that same day regarding the unrelated murder, . . . implicating Alston as the murderer in that matter. In the March 11 statement, Alston also identified Cannon, not King or Haskins, as Giles' killer claiming Cannon killed Giles for being a police informant.

On March 23, 2005, three letters were recovered from 2849 N. Taney Street (Alston's address) pursuant to a search warrant executed in connection to the unrelated murder. One of the letters recovered was handwritten by Alston (Alston letter) to an unidentified person. Part of the Alston letter read, "Ezel (*i.e.* Ernest Cannon) rocked Nate (*i.e.* Nathaniel Giles) for snitching on [L]em (*i.e.* Jerome King) too." This letter predated Alston's police statement because Alston was in custody when . . . his home was searched and the letters were discovered.

On May 6, 2005, King and Haskins were arrested for the murder of Nathaniel Giles. At trial, the Commonwealth argued that King and Haskins were motivated to kill Giles[] because he had implicated King as the supplier of the firearm used in the Thomas-Childs murder.

On September 1, 2005, Craig Lindsey (Lindsey) was arrested in an unrelated federal drug case. Initially, Lindsey was incarcerated in prison on State Road, Philadelphia, PA. In March 2006, while incarcerated at State Road, Lindsey came into contact with King. On April 23, 2006, based on conversations Lindsey allegedly had with King, Lindsey wrote a letter to the District Attorney's Office and was brought down to the Homicide Division of the Philadelphia Police Department where he gave a statement. Lindsey claimed that King told him that the gun used in the murder of Thomas-Childs was the one he gave to the shooter. When questioned at [the] King/Haskins trial about what expectations he had in providing this testimony with respect to his open federal drug case, Lindsey replied that he "ain't really know how it was going to affect it."

At the King/Haskins trial, Alston testified as a defense witness claiming that on the evening of Giles' murder he was walking with

Cannon when they spotted Giles. Cannon, believing that Giles was a police informant, crossed the street and shot Giles in the back of the head before fleeing. On cross, it was revealed that Alston, Haskins, and King were part of the same gang and that Alston was loyal to them. Additionally, it was revealed that during the police investigation into an unrelated murder, Alston learned that Cannon had implicat[ed] him as the murderer in that unrelated investigation. The Commonwealth argued that Alston's allegation that Cannon [murdered Giles] was a recent fabrication [that] Alston created as retaliation for Cannon implicating him in the unrelated murder.

On June 23, 2006, King was convicted by a jury of murder of the first degree, criminal conspiracy, and violation of the Uniform Firearms Act, while Haskins was convicted of murder and conspiracy but was found not guilty of the violation of the Uniform Firearms Act. King was sentenced to life imprisonment on the murder charge and a consecutive twenty to forty years for the conspiracy charge with a concurrent five[-]year sentence for the firearms charge. Haskins was sentenced to life imprisonment on the murder charge with a consecutive twenty to forty years for the conspiracy charge.

Trial Ct. Op., 11/12/20, at 1-4 (record citations omitted).[2]

Both King and Haskins filed post-sentence motions, and both were denied by operation of law. King and Haskins each filed a direct appeal. This Court affirmed Haskins' judgment of sentence on March 12, 2008. *Commonwealth v. Haskins*, 953 A.2d 599, 3303 EDA 2006 (Pa. Super. filed Mar. 12, 2008) (unpublished mem.) (*Haskins I*), *appeal denied*, 956 A.2d 432 (Pa. 2008). We affirmed King's judgment of sentence in a published opinion filed on October 17, 2008. *Commonwealth v. King*, 959 A.2d 405

_____

[2] For ease of discussion, we refer to a single trial court opinion. Although the trial court drafted separate Rule 1925(a) opinions in King's and Haskins' cases, the opinions are largely the same, and the portions quoted here are identical.

(Pa. Super. 2008) (***King I***).  King did not petition for allowance of appeal in our Supreme Court.

Appellees filed separate Post-Conviction Relief Act[3] (PCRA) petitions, and on June 29, 2011, Appellees filed a joint memorandum of law alleging the Commonwealth committed a ***Brady***[4] violation with respect to the Alston letter. On July 5, 2011, the PCRA court agreed with Appellees that the Commonwealth committed a ***Brady*** violation and granted Appellees a new trial.

On July 22, 2011, the Commonwealth appealed the July 5, 2011 order granting Appellees a new trial.  After review, in a consolidated appeal, our Court reversed the PCRA court's order and returned the matters to the PCRA court.  ***Commonwealth v. Haskins***, 60 A.3d 538 (Pa. Super. 2012) (***Haskins II***).  Appellees petitioned for allowance of appeal to our Supreme Court, and those petitions were denied on October 29, 2013. ***Commonwealth v. Haskins***, 78 A.3d 1090, 5 EAL 2013 (Pa. 2013);

---

[3] 42 Pa.C.S. §§ 9541-9546.

[4] ***See Brady v. Maryland***, 373 U.S. 83, 87 (1963) (stating, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution").  To establish a ***Brady*** violation, a criminal defendant must establish: "(1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued." ***Commonwealth v. Roney***, 79 A.3d 595, 607 (Pa. 2013) (citation omitted).

*Commonwealth v. King*, 78 A.3d 1090, 8 EAL 2013 (Pa. 2013). On remand,

the PCRA court subsequently denied Appellees' PCRA petitions.

On November 26, 2013, Haskins filed a petition for writ of *habeas corpus*

in federal district court, and following review, the district court denied Haskins'

petition. *See Haskins v. Folino*, NO. 13-6901, 2017 WL 1397261 (E.D.Pa.

Apr. 19, 2017). Haskins filed a timely appeal to the United States Court of

Appeals for the Third Circuit.

The trial court summarized the subsequent procedural history as

follows:

> After over a decade of appeals, on November 8, 2018, the United States Court of Appeals for the Third Circuit decided Haskins' *habeas* petition and granted him a new trial after finding that the Pennsylvania [Superior Court in *Haskins II*] misapplied the *Brady* materiality standard, [and held] that suppressing the Alston letter was a *Brady* violation.[5] On July 29, 2019, the PCRA court granted King a new trial based on the Third Circuit decision of Haskins' *habeas* petition.
>
> As a result of the Third Circuit decision, King and Haskins both filed a Motion to Dismiss Based on the Double Jeopardy Clauses of the Pennsylvania and the United States Constitutions. In addition to claiming the prosecution should be barred based on the Alston letter *Brady* violation, King raised an additional *Brady* violation claim asserting that the Commonwealth failed to disclose Lindsey's possible status as a federal confidential informant at the time of Haskins' and King's trial.
>
> In his Motion to Dismiss, King cited the opinion by the Honorable Paul S. Diamond in *U.S. v. Wilcox*, NO. 06-0445[, 2007 WL 2461820] (E.D.PA. Aug. 28, 2007), granting movant's motion to suppress in part and denying in part. This opinion revealed that after Lindsey's September 1, 2005, drug arrest he was recruited

---

[5] *See Haskins v. Superintendent Greene SCI*, 755 Fed.Appx. 184 (3d Cir. 2018) (*Haskins III*).

as a confidential informant in hopes of mitigating "his punishment by helping police," *Wilcox*, at page 6, and that police sought to protect his identity as a confidential informant to "ensure Lindsey's continue[d] assistance with other investigations." *Id.* at page 15.

Assistant District Attorney Jason Bologna was assigned to try the King/Haskins trial. ADA Bologna testified at the August 19, 2020, Double Jeopardy motion hearing that he understood the Alston letter to mean that someone other than King or Haskins shot and killed Giles because Giles was cooperating with police in the Thomas-Childs investigation. ADA Bologna testified at the Double Jeopardy motion hearing, that he understood that this additional statement was significant but made a deliberate decision not to turn it over to the defense on the assumption that this handwritten note was merely cumulative of the statement which Alston had given to the police on March 11, 2005. The Commonwealth made no argument as to the defense claim that information on Lindsey's cooperation with local and federal law enforcement agencies was withheld from the defense during the trial.

On August 25, 2020, this court granted [Appellees'] Motion to Dismiss Based on the Double Jeopardy Clauses of the Pennsylvania and the United States Constitutions. On September 1, 2020, the Commonwealth filed a Motion to Reconsider the granting of the double jeopardy motions and a request to the court to file a Findings of Fact and Conclusions of Law. The Findings of Fact and Conclusions of Law were filed on September 24, 2020, holding that a retrial was barred by the double jeopardy rule and granted the defendants' motions. On October 20, 2020, the Commonwealth [appealed].

Trial Ct. Op., 11/12/20, at 5-6. Both the trial court and the Commonwealth complied with Pa.R.A.P. 1925.

On appeal, the Commonwealth raises the following issues:

Did the [trial] court err by precluding [Appellees'] retrial for the murder of a federal informant on double jeopardy grounds where its finding of prosecutorial overreaching was factually erroneous; and where it erred as a matter of law by failing to consider, as [*Commonwealth v. Johnson*, 231 A.3d 807 (Pa. 2020)] requires, society's strong interest in bringing the guilty to justice, and whether retrial threatened the conviction of innocent people?

Commonwealth's Brief at 6 (unpaginated).

Our standard and scope of review in this case are as follows:

An appeal grounded in double jeopardy raises a question of constitutional law. This Court's scope of review in making a determination on a question of law is, as always, plenary. As with all questions of law, the appellate standard of review is *de novo*. To the extent that the factual findings of the trial court impact its double jeopardy ruling, we apply a more deferential standard of review to those findings.

Where issues of credibility and weight of the evidence are concerned, it is not the function of the appellate court to substitute its judgment based on a cold record for that of the trial court. The weight to be accorded conflicting evidence is exclusively for the fact finder, whose findings will not be disturbed on appeal if they are supported by the record.

*Commonwealth v. Sanchez*, --- A.3d ----, ---, 2021 PA Super 197, 2021 WL 4515356, at *5 (Pa. Super. filed Oct. 4, 2021) (citations omitted and some formatting altered). We must also consider the following:

The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Article 1, § 10 of the Pennsylvania Constitution protect a defendant from repeated criminal prosecutions for the same offense. Ordinarily, the law permits retrial when the defendant successfully moves for mistrial. If, however, the prosecution engages in certain forms of intentional misconduct, the Double Jeopardy Clause bars retrial. Article I, § 10, which our Supreme Court has construed more broadly than its federal counterpart, bars retrial not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial. An error by a prosecutor does not deprive the defendant of a fair trial. However, where the prosecutor's conduct changes from mere error to intentionally subverting the court process, then a fair trial is denied.

***Commonwealth v. Byrd***, 209 A.3d 351, 353 (Pa. Super. 2019) (citation omitted). "Dismissal is an appropriate remedy in such a case because a mistrial would be an inadequate remedy for systematic intentional prosecutorial misconduct." ***Id.*** (citation omitted and formatting altered). "By and large, most forms of undue prejudice caused by inadvertent prosecutorial error or misconduct can be remedied in individual cases by retrial. Intentional prosecutorial misconduct, on the other hand, raises systematic concerns beyond a specific individual's right to a fair trial that are left unaddressed by retrial." ***Id.*** (citation omitted). "[A] fair trial is not simply a lofty goal, it is a constitutional mandate, . . . and where that constitutional mandate is ignored by the Commonwealth, we cannot simply turn a blind eye and give the Commonwealth another opportunity." ***Id.*** (citation omitted).

In its opinion, the trial court addressed the Commonwealth's claim of error as follows:

> At the August 19, 2020, double jeopardy motion hearing, ADA Bologna testified that he knew the Alston letter to mean that neither King [n]or Haskins were involved in Giles' murder. He understood that the letter was significant but made the conscious decisions not to turn over the letter to [Appellees]. At trial, when Alston testified that Cannon was the one who killed Giles, the Commonwealth attacked his motiv[e] to testify by claiming Alston only recently fabricated this story because Cannon implicated him in an unrelated homicide. Had the Commonwealth shared the Alston letter with [Appellees], [counsel for Appellees] could have shown that the letter predated Alston's revelation and that his testimony was not recently fabricated in retaliation to Cannon implicating him in an unrelated homicide. Therefore, this court found that the Commonwealth acted recklessly when it deliberately withheld the crucial piece of evidence (the Alston letter) which impaired [Appellees'] ability to have a fair trial in this

matter. Because they did not have the benefit of this evidence which was consciously and intentionally withheld by the Commonwealth, they were unable to put forth the defense of prior consistent statement to the jury. If [Appellees] had this evidence it would have been able to offer for the consideration of the jury that on two (2) prior occasions, Alston had identified some other person, other than King or Haskins, as the killer of Giles (*i.e.* the March 11 statement and the Alston letter).

The [trial c]ourt also found that the Commonwealth withheld evidence that Lindsey was a confidential informant arising from his arrest on September 1, 2005, and was supplying police with information in other investigation in hopes of mitigating his own punishment, which may have impacted his desire to be a truthful witness at this trial.

United States law requires the prosecution to turn over favorable evidence to the defendant when it is material to either the guilt or sentencing phase. ***Brady v. Maryland***, 373 U.S. 83, 87 (1963). This "includes evidence that would affect the credibility of a witness." ***Haskins v. Superintendent Greene SCI***, 755 Fed.Appx. 184, [188] (3d Cir. 2018) (citing ***Wilson v. Beard***, 589 F.3d 651, 659, 666-67 (3d Cir. 2009)). The prosecution must disclose information it actually knows "and all information in the possession of the prosecutor's office, the police, and others acting on behalf of the prosecution." ***Id.*** . . .

Lindsey was arrested in September 2005, and he began cooperating with local and federal authorities in criminal investigations in hopes of mitigating his own sentence.[fn3] At the time of the King/Haskins trial, Lindsey was incarcerated in a federal prison with an open federal case. Looking at the timeline of Lindsey's arrest and testimony at the King/Haskins trial, along with the fact that Lindsey's role as a confidential informant was known to Philadelphia Police, indicate that his role as an informant was withheld by the Commonwealth in violation of prong two of ***Brady***. The Commonwealth's trial theory of motive was that King and Haskins murdered Giles because Giles was cooperating with federal authorities in the investigation of the murder of ten-year old Faheem Thomas-Childs. Lindsey wrote a letter to the DA after allegedly talking to King while they were both incarcerated in the Philadelphia prison system. Lindsey learned that King supplied the gun that was used to kill Thomas-Childs. At trial, Lindsey testified that King told him that the gun used in the Thomas-Childs murder was King's. Lindsey's testimony helped establish a major

- 10 -

part of the Commonwealth's case theory; King and Haskins murdered Giles because he implicated King in the Thomas-Childs murder. Lindsey's informant status was material and [Appellees] were prejudiced by being unable to impeach Lindsey's credibility when Lindsey testified that he "ain't really know how testifying at the King/Haskins trial was going to affect" his open federal case. In failing to disclose Lindsey's involvement with law enforcement as an informant, the Commonwealth committed a second **Brady** violation.

> [fn3] During the Wilcox hearing, it was a Philadelphia Police Officer John Coyne who testified credibly that "he did not disclose in the affidavit for the search warrant that Lindsey was a C.I. . . . because he was seeking to protect Lindsey's identity both for reasons of safety and to ensure Lindsey's continue[d] assistance with other investigations." **U.S. v. Hassan Wilcox**, NO. 06-0445, [2007 WL 2461820,] page 15 (E.D.Pa. Aug. 28, 2007).

Therefore, the Commonwealth engaged in prosecutorial overreaching when it had in its possession exculpatory evidence in the form of the Alston letter, which it knew was significant but instead deliberately chose not to turn it over to [Appellees and] later arguing [that] Alston's testimony [where he testified] that another person killed Giles was [a] recent fabrication when it should have known that was not the case, exhibiting a conscious disregard to King's or Haskins' constitutional rights to a fair trial. The Commonwealth again engaged in prosecutorial overreaching by failing to disclose that Lindsey was a confidential informant for the Philadelphia Police Department while using his testimony to establish motive in the case against King and Haskins, further eroding their chances at a fair trial.

Due to the passage of time and fading memories and possible unavailability of witnesses who could have been explored at the time of this trial, [Appellees] are severely limited in their ability to mount a defense, despite the assertion of the Commonwealth that a new trial is a fair remedy.

Trial Ct. Op., 11/12/20, at 8-11 (record citations omitted and some formatting altered).

The Commonwealth has acknowledged a violation of the rule in **Brady** for failing to provide Appellees the Alston letter. However, it argues that dismissal of the charges was not warranted because the prosecutor's conduct constituted an error rather than overreaching. Commonwealth's Brief at 21-27 (unpaginated). Additionally, the Commonwealth also contends that the trial court erred when it concluded that the Commonwealth overreached in not disclosing that Craig Lindsey was a police informant. The Commonwealth asserts that although **Johnson** provides that "non-intentional prosecutorial conduct may constitute a bar to retrial," barring retrial is an extreme remedy for rare situations where the prosecutor's actions are "so egregious that they constitute overreaching by seeking conviction above justice[.]" **Id.** at 21 (unpaginated). The Commonwealth notes that although "prosecutorial errors are an 'inevitable part of the trial process,' prosecutorial overreaching is not." **Id.** at 25 (unpaginated) (quoting **Johnson**, 231 A.3d at 824) (additional citation omitted)). "[O]verreaching signals that the judicial process has fundamentally broken down because it reflects that the prosecutor, as representative of an impartial sovereign, is seeking conviction at the expense of justice." **Id.** (quoting **Johnson**, 231 A.3d at 822). The Commonwealth emphasizes that while the prosecutor in **Johnson** overreached, the prosecutor in the instant cases did not. **Id.**

Briefly, we summarize the facts and holding in **Johnson**. In that case, our Supreme Court considered whether retrial is barred based on the constitutional protections against double jeopardy "where the Commonwealth

obtains a conviction based on false evidence and its misconduct, while not undertaken with the intent to deny the defendant a fair trial, nevertheless stems from prosecutorial errors that rise substantially above ordinary negligence." *Johnson* 231 A.3d at 810.

The *Johnson* case involved the murder of Walter Smith outside a Philadelphia bar. During the investigation of the crime scene, the police recovered a red baseball cap near Smith's body, and the police assigned this cap a property receipt number. *Id.* at 810. After the murder, Smith's friend Debbie Williams provided a statement to the police. *Id.* at 810-11. Williams informed the police that she had been with Smith on the night of the murder, and she described what she had seen. *Id.* at 811. Additionally, Williams told the investigators that Smith was wearing a black cap at the time of the shooting that Williams had herself collected from the crime scene. This black cap had a bullet hole in it, and Williams gave the black cap to the police. The police assigned the black cap a property receipt number separate from the receipt number assigned to the red cap. Forensic testing of the black cap revealed the presence of Smith's blood. *Id.*

Years later, evidence linking Johnson to the murder was uncovered, and the police collected a sample of Johnson's DNA. *Id.* Subsequent testing of the red cap revealed the presence of Johnson's DNA. *Id.* At trial, the prosecuting attorney proceeded under the theory that one cap, the red one, had both Smith's blood and Johnson's sweat on it. *Id.* at 811-13. The Commonwealth's forensics expert also erroneously indicated that the blood

and DNA evidence were found on the same cap. *Id.* at 812. Further, an investigating officer testified that he saw blood under the brim of the red cap when he recovered it. *Id.* A jury convicted Johnson and sentenced him to death. *Id.* at 813.

Following the review of a forensics lab report, which revealed that a second cap had been analyzed, the Commonwealth agreed that Johnson was entitled to a new trial, and Johnson moved to dismiss the charges. *Id.* Our Supreme Court held that retrial was barred and outlined two significant errors made by the prosecuting attorney:

> [F]irst, there was a notable discrepancy between the property receipt numbers for the two caps. The prosecutor was aware this meant that the associated results reflecting the presence of [Smith's] blood and [Johnson's] DNA might have related to different pieces of physical evidence. Yet, in the face of this information, he never sought to verify his working hypothesis that the receipt numbers pertained the same baseball cap. He did not even notice this error at the preliminary hearing when he had in his possession property receipt number 2425291, which clearly stated that it was associated with a black baseball cap. Second, in preparation for a capital case, the prosecutor did not obtain a criminalistics report which would have summarized the evidence connected with the matter and revealed that there were two different caps involved.

*Id.* at 826-27. The Supreme Court determined that the Commonwealth's "almost unimaginable mistakes," though unintentional, were "strongly suggestive of a reckless disregard for consequences and for the very real possibility of harm stemming from the lack of thoroughness in preparing for a first-degree murder trial." *Id.* at 826-27 (internal quotation marks omitted).

The **Johnson** Court concluded that the Commonwealth had not acted with the intent to deprive Johnson of a fair trial. However, it further explained and expanded prior caselaw defining overreaching:

Under Article I, Section 10 of the Pennsylvania Constitution,[6] prosecutorial overreaching sufficient to invoke double jeopardy protections includes misconduct which not only deprives the defendant of his right to a fair trial, but is undertaken recklessly, that is, with a conscious disregard for a substantial risk that such will be the result. This, of course, is in addition to the behavior described in [**Commonwealth v. Smith**, 615 A.2d 321 (Pa. 1992)], relating to tactics specifically designed to provoke a mistrial or deny the defendant a fair trial. In reaching our present holding, we do not suggest that all situations involving serious prosecutorial error implicate double jeopardy under the state Charter. To the contrary, we bear in mind the countervailing societal interests mentioned above regarding the need for effective law enforcement, **see generally State v. Michael J.**, 274 Conn. 321, 875 A.2d 510, 534 (2005) (referring to the need for an "optimal balance between the defendant's double jeopardy rights and society's interest in enforcing its criminal laws"), and highlight again that, in accordance with long-established double-jeopardy precepts, retrial is only precluded where there is prosecutorial overreaching – which, in turn, implies some sort of conscious act or omission. Notably, however, this Court has explained, albeit in a different context, that reckless conduct

_____

[6] Article 1, Section 10 of the Pennsylvania Constitution provides in relevant part, as follows:

Except as hereinafter provided no person shall, for any indictable offense, be proceeded against criminally by information, except in cases arising in the land or naval forces, or in the militia, when in actual service, in time of war or public danger, or by leave of the court for oppression or misdemeanor in office. Each of the several courts of common pleas may, with the approval of the Supreme Court, provide for the initiation of criminal proceedings therein by information filed in the manner provided by law. No person shall, for the same offense, be twice put in jeopardy of life or limb . . . .

Pa. Const. Art. 1, § 10.

subsumes conscious behavior. ***See Tayar v. Camelback Ski Corp., Inc.***, [47 A.3d 1190, 1200 (Pa. 2012)] (indicating that recklessness, as distinguished from negligence, "requires conscious action or inaction which creates a substantial risk of harm to others").

***Johnson***, 231 A.3d at 826. Bearing these principles in mind, we must now determine whether the trial court erred in barring retrial based on double jeopardy.

## Disclosure of the Alston Letter

As discussed above, the Commonwealth failed to provide the Alston letter to Appellees before trial. After review, we agree that the Commonwealth committed a serious ***Brady*** violation. The Third Circuit addressed this issue as follows:

> [G]iven that the suppressed letter contained direct evidence going to a central issue in this case, the jury's lack of access to it causes us to question whether the verdict is worthy of confidence. The Commonwealth presented two disinterested witnesses who implicated Haskins in the murder. Portions of their trial testimony were inconsistent with their earlier statements to the police and with aspects of either their own or each other's testimony. Even though the two witnesses were disinterested and, as Haskins concedes, neither had a motive to lie, a compelling alternate version of events, presented with corroborating evidence, might have cast doubt on their accounts. Alston's testimony provided such an alternative. Alston testified that Cannon shot Giles and neither Haskins nor King was present.
>
> Alston's credibility was vigorously attacked on multiple fronts. He was confronted with his five pending trials, his prior juvenile adjudication for possession of stolen property, and his admitted loyalty to and bias in favor of Haskins. Moreover, in response to Alston's testimony that Cannon and not King shot Giles, the prosecutor asserted through his questioning that Alston fingered Cannon for Giles's murder in retaliation for Cannon having implicated Alston in a separate murder. Put plainly, the

- 16 -

prosecution sought to suggest to the jury that Alston's testimony blaming Cannon was a recent fabrication made in retaliation for Cannon's then recent disclosure of Alston's role in another murder.

The ***Brady*** material here would have corroborated Alston's testimony, undercutting that challenge. The letter identifying Cannon as Giles's killer was written before Cannon's statements to police implicating Alston in a murder. Thus, even before a retaliatory motive may have existed, Alston said Cannon shot Giles. Had the letter been disclosed, the prosecutor would have been unable to pursue the recent fabrication challenge, and if he attempted to do so, Haskins could have easily refuted that accusation by pointing to his letter to someone with whom he shared a close relationship, written before the alleged motive to retaliate against Cannon arose. Given the importance of Alston's credibility and the inconsistencies in the testimony of the prosecution's witnesses, we believe that there is no room for fair-minded disagreement that the letter calls into question whether the verdict returned is worthy of confidence. As a result, the Superior Court unreasonably applied ***Brady*** and its progeny when it held that the evidence was not material. Haskins is therefore entitled to *habeas* relief.

For the foregoing reasons, we will reverse the District Court's order denying Haskins's habeas petition, and the Commonwealth is directed to retry Haskins within 120 days or release him.

***Haskins III***, 755 Fed.Appx. at 189-90 (citations omitted and some formatting altered). However, although the Commonwealth committed a ***Brady*** violation, we conclude that the trial court erred in granting Appellees' motion to bar retrial.

Pursuant to ***Johnson***, the trial court must consider the countervailing societal interests regarding the need for effective law enforcement concerning the balance between a double jeopardy rights and society's interest in enforcing its criminal laws. ***See Johnson***, 231 A.3d at 826. We note that retrial is only precluded where there is prosecutorial overreaching, which

- 17 -

implies some sort of conscious act or omission. ***See id.*** Moreover, the constitutional double jeopardy prohibition:

> is not primarily intended to penalize prosecutorial error, but to protect citizens from the embarrassment, expense and ordeal of a second trial for the same offense and from compelling them to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent they may be found guilty.

***Id.*** (citation omitted and formatting altered).

With respect to the Alston letter itself, the record reflects that the prosecutor testified that he received the undated Alston letter, which had no postmark or envelope attached, after he began working on Appellees' case. N.T., 8/19/20, at 31. ADA Bologna testified that he thought that the Alston letter was written after Alston's arrest and was, therefore, only cumulative of Alston's statements to police. ***Id.*** at 31-35. However, ADA Bologna's error led him to conclude incorrectly that Alston's subsequent exculpatory statement was a recent fabrication. ***Id.*** at 31-38. The prosecutor later learned during PCRA proceedings that the Alston letter was written before Alston's arrest. ***Id.*** at 32-35.

The trial court found that the prosecutor immediately recognized the significance of the Alston letter and consciously decided not to turn it over to Appellees prior to trial. Trial Ct. Op., 11/12/20, at 6, 8-9. The record does

not support this conclusion.[7]  ***See*** N.T., 8/19/20, at 129, 131-132, 148-149 (revealing that ADA Bologna testified that he did not immediately recognize the significance of the Alston letter or understand when the Alston letter was written, and the Commonwealth was not aware of the date the letter was written until it cross-referenced Appellees' cases with other cases years after the trial).  Indeed, the record is devoid of any evidence that ADA Bologna was aware or should have been aware of the significance of the Alston letter until the PCRA proceedings.  Rather, ADA Bologna testified that he believed that the Alston letter had been written after Alston was arrested.  ***Id.*** at 44-47.  ADA Bologna then placed the letter in a file and was not reminded of its existence until years after trial.  ***Id.*** at 47-48.  On its face, the undated Alston letter did not present the "red flag" that the separate property receipts for the two caps in ***Johnson*** did.  We conclude that the prosecutor's mistake concerning the Alston letter, although significant, does not constitute overreaching that would require the imposition of the double jeopardy bar precluding the retrial of this case.  ***See id.*** 44-48, 54-55, 97-106 (detailing ADA Bologna's description of his review of the Alston letter, his erroneous belief as to when it was written, his misunderstanding of its significance, and his admission of his mistake).

---

[7] We note that the Attorney General of Pennsylvania in an *amicus curiae* brief emphasizes that the trial court's conclusion that the prosecutor made a "deliberate decision" not to turn over the Alston letter to Appellees is not supported by the record. *Amicus* Brief at 22 (citing N.T. 8/19/20 at 44).

The prosecutor's error in the case at bar does not rise to the level of the "almost unimaginable" error in **Johnson** where the Commonwealth's actions led it to conjure a cap containing forensic evidence of the victim's blood and the accused's DNA and indelibly linking the accused to the murder. **Johnson**, 231 A.3d at 816, 826-27. As noted, in **Johnson**, the red cap was a crucial part of the Commonwealth's case, yet there was no single cap bearing both Smith's blood and Johnson's DNA. In **Johnson**, the Commonwealth's failure to conduct even a cursory review of its evidence led to a non-existent piece of evidence to establish Johnson's guilt. This recklessness on the part of the Commonwealth in **Johnson** represented an instance of seeking a conviction at the expense of justice, and it rose to the level of overreaching. **Id.** at 824, 827.

In the instant case, the prosecutor violated **Brady** by failing to turn over the Alston letter, and we reiterate that the prosecutor's intent and "good faith" are irrelevant concerning **Brady** material. **Brady**, 373 U.S. at 87. However, for the reasons discussed above, we cannot conclude that the prosecution engaged in overreaching or attempted to subvert justice. Moreover, society has a compelling interest in bringing the guilty to justice, and under the facts and circumstances presented here, we cannot conclude that retrial would increase the possibility that an innocent person would be found guilty. Further distinguishing the instant case from **Johnson** is the evidence presented at trial concerning Appellees' guilt including motive, independent and disinterested eyewitnesses, identification of Appellees as the perpetrators, and

factual evidence contradicting Alston's version of events. Trial Ct. Op., 11/12/20, at 1-3. For these reasons, the Commonwealth's *Brady* violation merits relief to Appellees in the form of a new trial, but not the application of the double jeopardy bar precluding the retrial of this case. *See Byrd*, 209 A.3d at 353. Accordingly, we conclude that the trial court erred in barring retrial based on the *Brady* violation relative to the Alston letter.

### Disclosure of Lindsey's Identity

Next, we must address the trial court's finding that the Commonwealth committed a second *Brady* violation concerning the Commonwealth's alleged failure to identify Lindsey as an informant for federal law enforcement. The record revels that ADA Bologna testified that prior to trial, he obtained all available discovery relative to Lindsey, this included reaching out to the Assistant U.S. Attorney who was prosecuting Lindsey in a federal matter and Lindsey's own defense attorney. N.T. 8/19/20 at 66. ADA Bologna specifically stated that he discovered no information revealing that Lindsey was a federal informant. *Id.* at 76. ADA Bologna testified: "[Lindsey] was a person who was arrested on a local drug case, was in a county facility, and reached out to the District Attorney's Office with information about an open homicide. That's what I believed Mr. Lindsey to be, a person who had information about a homicide." *Id.* ADA Bologna testified that he specifically asked the Assistant U.S. Attorney if Lindsey was a cooperating witness and was not informed of any relationship between Lindsey and federal authorities. *Id.* at 107-112. Moreover, ADA Bologna found no evidence of a cooperation agreement. *Id.*

Additionally, although King cited **Wilcox** in his motion to dismiss[8] to support the proposition that Lindsey was a known informant, there is no indication that Lindsey's status as an informant was known at the time of trial in Appellees' case. **Id.**; **see also Wilcox**, 2007 WL 2461820.

Because Lindsey's identity as an informant was unknown and kept from the Commonwealth, we cannot conclude that the Commonwealth willfully or inadvertently suppressed evidence of Lindsey's identity in violation of **Brady**. **See Roney**, 79 A.3d at 607. Moreover, because the Commonwealth attempted to obtain information relative to Lindsey's cooperation with the federal government, but Lindsey's status was withheld from the Commonwealth, we further conclude that there was no constructive knowledge. In other words, we cannot attribute cross-jurisdiction constructive knowledge of Lindsey's activities as a federal informant when, despite requesting the information, the U.S. Attorney's Office did not or could not disclose the information to the Commonwealth prior to trial. **See U.S. v. Risha**, 445 F.3d 298 (3d Cir. 2006) (discussing imputing cross-jurisdiction constructive knowledge).[9] In **Risha**, the Third Circuit noted as follows:

> It appears that in addressing the issue of cross-jurisdiction constructive knowledge, most courts of appeals have looked to the same questions that we have. Those questions include: (1) whether the party with knowledge of the information is acting on

---

[8] King's Mot. to Dismiss, 11/19/19.

[9] Although federal circuit court decisions are not binding, they may be considered for their persuasive value by the courts of this Commonwealth. **Commonwealth v. Little**, 246 A.3d 312, 328 n.18 (Pa. Super. 2021).

the government's "behalf" or is under its "control"; (2) the extent to which state and federal governments are part of a "team," are participating in a "joint investigation" or are sharing resources; and (3) whether the entity charged with constructive possession has "ready access" to the evidence.

*Risha*, 445 F.3d at 304.

Considering the decision in *Risha* for its persuasive value, we nevertheless conclude that there is no evidence supporting cross-jurisdiction constructive knowledge in this case. As discussed above, there is no evidence that the Commonwealth knew of Lindsey's status as an informant for the federal government. There is no indication that the Commonwealth and federal authorities were working jointly or sharing resources in this case, and the Commonwealth did not have access to, or was denied access to, the information concerning Lindsey's identity. *See Risha*, 445 F.3d at 304

After review, we are constrained to conclude that the trial court erred in its conclusion that the Commonwealth committed a *Brady* violation related to disclosing Lindsey's role as an informant. *See Roney*, 79 A.3d at 607. Moreover, because we conclude that there was no *Brady* violation in this regard, we further conclude that the trial court erred in barring the retrial of this case.

**Conclusion**

Although we agree that the Commonwealth committed a serious *Brady* violation when it failed to turn over the Alston letter to Appellees, we conclude that the trial court erred in barring retrial. Moreover, we conclude that there was no *Brady* violation regarding the non-disclosure of Lindsey's identity as

- 23 -

an informant for federal law enforcement authorities, and therefore the trial court erred in barring retrial on this basis. Accordingly, we reverse the order barring retrial and remand this matter for a new trial for Appellees consistent with this opinion.

Order reversed. Case remanded for a new trial. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/14/2021